IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AUTOMATED BUSINESS COMPANIES,  §
                               §
          Plaintiff,           §
                               §
v.                             §        CIVIL ACTION NO. H-06-1032
                               §
ENC TECHNOLOGY CORP., et al.,  §
                               §
          Defendants.          §

**TABLE OF CONTENTS**

I.    **Background**.......................................... 2

      A.  Patent Background................................ 2

      B.  Procedural History............................... 6

II.   **Legal Standard for Claim Construction**................ 10

      A.  Intrinsic Evidence............................... 13

      B.  Extrinsic Evidence............................... 16

III.  **Construction of Disputed Terms**....................... 17

      A.  "Website"........................................ 18

          1.  Web Pages or Servers........................ 19

          2.  Web Servers, One or More Servers............ 27

          3.  Hosting Web Pages, Retrievable by a Web
              Browser Using HTTP and HTML Interpretation... 32

              a.  Hosting Web Pages....................... 33

              b.  Retrievable by a Web Browser............ 34

              c.  HTTP and HTML........................... 35

          4.  Located on the Internet by Use of a URL...... 38

          5.  Provided by a Service Provider.............. 39

6.    Validating Logon Commands and Sending, and
Receiving, Processing Instructions........... 40

7.    The Same Website Both Receives Valid Logon
Commands and Receives and Sends the Data
Signals that Control the Remote Computer
Unit......................................... 41

8.    Conclusion................................... 42

B.   "Logon Command"/"Valid Logon Command"............. 43

1.    The Constituent(s) of a Logon Command........ 44

2.    The Function of a Logon Command.............. 47

3.    Validation of a Logon Command................ 51

4.    Conclusion................................... 54

C.   "Associates the Valid Logon Command with the
Remote Computer Unit"............................ 55

1.    "Associates"................................. 56

2.    "Remote Computer Unit"....................... 58

3.    Conclusion................................... 59

D.   "Billing for Access to the Service"/"Generating
a Bill for the Service".......................... 60

1.    "Billing"/"Generating a Bill"................ 60

2.    "Access to the Service"/"The Service"........ 65

3.    Conclusion................................... 67

E.   "Monitoring Payments"/"Monitoring Payments Made
by the Customer to Maintain the Customer's Access
to the  Service"................................. 67

1.    "Monitoring Payments"........................ 67

a.  Automation.............................. 68

b.  Various Persons or Devices.............. 69

c.  Past Services........................... 70

2.   "Monitoring Payments Made by the Customer
     to Maintain the Customer's Access to the
     Service"....................................... 71

F.   "Remote System Controller"........................ 72

1.   "Computer Elements" or "Computer or
     Controller"................................... 73

2.   Functions of a Remote System Controller...... 74

     a.  Validating Logon Commands................ 74

     b.  Interfacing the Local Portion/Computer
         Unit with the Remote Computer Unit....... 74

     c.  Operating the Remote Computer Unit....... 75

3.   Location Limitations......................... 76

4.   Exclusions................................... 78

     a.  Switches, Routers, and Other Similar
         Passive Devices.......................... 78

     b.  Websites................................. 81

5.   Conclusion................................... 83

G.   "Network Control Computer"........................ 84

1.   "Computational Devices" or "Computer or
     Controller"................................... 85

2.   Functions of a Network Control Computer...... 86

     a.  Maintaining a List of Access Codes....... 86

     b.  Checking the Validity of Logon Commands.. 90

     c.  Interfacing the Local Computer Unit with
         the Remote Computer Unit................. 92

     d.  Operating the Remote Computer Unit....... 93

3.   Exclusions................................... 94

4.   Conclusion................................... 95

H.   "Established on the World Wide Web"............... 95

    1.   Accessible as a Service..................... 96

    2.   Accessible on the Internet and Locatable
       by a URL.................................... 96

    3.   Able to be Communicated with through a
       Browser Using HTTP and HTML Interpretation... 98

       a.   Communicated with through a Browser...... 98

       b.   HTTP and HTML........................... 100

    4.   Conclusion................................. 104

I.   "Video Signals".................................. 104

    1.   Meaning of "Video"......................... 105

    2.   A Type of Data Signals..................... 107

    3.   Sent from the Remote Computer Unit to the
       Local Computer Unit........................ 111

    4.   Conclusion................................. 112

J.   "Split Personal Computer System".................. 112

    1.   One or Multiple Computers.................. 113

    2.   Large Distance Apart....................... 119

    3.   The Functions of the Local Portion and the
       Remote Computer Unit....................... 120

    4.   The Role of the Remote System Controller
       and the Purpose of the Split Personal
       Computer Unit.............................. 121

    5.   Conclusion................................. 122

**IV.   Order** .............................................. 122

## MEMORANDUM OPINION ON CLAIM CONSTRUCTION

This is a patent infringement suit involving certain claims of United States Patent Nos. 6,360,253 ("'253 patent"), 6,999,945 ("'945 patent"), and 7,016,943 ("'943 patent").  The plaintiff, Automated Business Companies ("ABC"), and the sole remaining defendant, WebEx Communications, Inc. ("WebEx"), disagree as to the meaning of several terms used in the asserted patent claims and, therefore, ask the court to construe the disputed terms.  See Markman v. Westview Instruments, Inc., 116 S. Ct. 1384, 1387 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In support of its preferred constructions, ABC has filed Plaintiff ABC's Opening Claim Construction Submission ("ABC's Brief") (Docket Entry No. 154) and Plaintiff ABC's Response to WebEx's Claim Construction Submission ("ABC's Response") (Docket Entry No. 165).  WebEx has filed Defendants' Brief in Support of Their Proposed Claim Constructions ("WebEx's Brief") (Docket Entry No. 156)[1] and Responsive Claim Construction Brief of Defendant WebEx Communications, Inc. ("WebEx's Response") (Docket Entry No. 166).  The court, after carefully considering the parties'

---

[1]WebEx filed this brief jointly with co-defendants Net Transmit & Receive, SL, and NTR North America, LLC.  All claims by and against these two co-defendants were subsequently dismissed with prejudice.  See Final Judgment as to Automated Business Companies' Claims against Defendants NTR North America, LLC and Net Transmit & Receive, SL, Docket Entry No. 184.

arguments, the evidence in the record, and the applicable law, construes the disputed claim terms as explained below.

## I.  Background

### A.  Patent Background

Each of the three patents asserted in this action claim priority to a common parent, United States Patent No. 6,243,743 ("'743 patent"), the application for which was filed on January 29, 1998.[2]  The '253 patent issued on March 19, 2002, and is a continuation of the '743 patent.[3]  The '945 patent issued on February 14, 2006, and is a continuation-in-part of the '743 patent.[4]  The '943 patent issued on March 21, 2006, and is a continuation of application No. 10/050,624, now abandoned, which was a continuation of the '253 patent.[5]

The '253 patent and the '943 patent share a common specification, except for the abstract, and are directed to a "split personal computer system."[6]  The '945 patent is directed to

---

[2]See '253 patent, at cover (included in ABC's Brief, Docket Entry No. 154, at Exhibit 1); '945 patent, at cover (included in ABC's Brief, Docket Entry No. 154, at Exhibit 2); '943 patent, at cover (included in ABC's Brief, Docket Entry No. 154, at Exhibit 3).

[3]'253 patent, at cover.

[4]'945 patent, at cover.

[5]'943 patent, at cover.

[6]See '253 patent; '943 patent.

a "multiple customer and multiple location PC service provider system."[7]  All three patents involve similar inventions that enable an individual user to control or utilize one or more remotely located computer units via a local interface device.

Although each of the asserted claims vary in important ways, each claim generally outlines an invention made up of or utilizing three elements:  (1) the local element, (2) the intermediate element, and (3) the remote element.  The local element is an interface device physically located in the same place as the user through which the user inputs commands and receives output, but which itself has minimal functionality and does not perform the computing functions desired by the user.[8]

The intermediate element -- referred to in the asserted patent claims as a "remote system controller,"[9] "network control computer,"[10] or "website"[11] -- essentially facilitates the connection

---

[7]'945 patent, at cover.

[8]See '253 patent, col.2 ll.20-23, col.4 ll.23-30; '945 patent, col.4 l.48 - col.5 l.13, col.5 l.51 - col.6 l.4; '943 patent, col.2 ll.23-26, col.4 ll.28-35.

[9]'253 patent, claim 16 (as amended) (full text of claim 16, as amended, is included in WebEx's Brief, Docket Entry No. 156, at Appendix A1, at 1); '943 patent, claim 1 (as amended) (full text of claim 1, as amended, is included in WebEx's Brief, Docket Entry No. 156, at Appendix A1, at 2).

[10]'943 patent, claim 2 (as amended) (full text of claim 2, as amended, is included in WebEx's Brief, Docket Entry No. 156, at Appendix A1, at 2).

[11]'945 patent, claims 3-5 (full text of claims 3, 4, and 5, written in independent form, are included in WebEx's Brief,
(continued...)

-3-

between the local element and the remote element.[12]   In all of the
asserted claims, the intermediate element performs at least two key
functions.[13]   First, the intermediate element receives logon
commands from the local element and checks their validity.[14]
Second, if the logon commands are valid, the intermediate element
establishes the connection between the local element and the
appropriate computer unit in the remote element, allowing the user
to operate the remote computer unit.[15]

_____

[11](...continued)
Docket Entry No. 156, at Appendix A1, at 3-4).  In the written
description and drawings of the '945 patent, the intermediate
element is referred to as the "computer service control unit."
See, e.g., '945 patent, at Figure 1.

[12]See '253 patent, col.5 ll.4-24, col.7 ll.43-56; '945
patent, col.4 ll.19-48, col.5 ll.24-30, col.5 ll.42-50, col.6
ll.14-64; '943 patent, col.5 ll.8-28, col.7 ll.48-61.

[13]WebEx suggests that in some of the asserted claims the
intermediate element also tracks the time of the connection and
bills the user or generates a bill accordingly.  WebEx's Brief,
Docket Entry No. 156, at 3.  The language of the asserted claims,
however, does not clearly associate that function with the
intermediate element.

[14]'253 patent, claim 16 (as amended) ("a remote system
controller . . . adapted to receive remote logon commands [and]
check the remote logon commands for validity"); '943 patent,
claim 1 (as amended) ("receiving and checking the validity, by
the remote system controller, a valid logon command"); '943
patent, claim 2 (as amended) ("a network control computer . . .
to connect the remote computer unit to the local computer unit
. . . upon receipt and checking the validity of a valid logon
command identifying the remote computer unit"); '945 patent,
claims 3-5 ("receiving, by the website, a valid logon command
. . . whereby the website associates the valid logon command with
the remote computer unit").

[15]'253 patent, claim 16 (as amended) ("a remote system
controller . . . adapted to . . . interface each individual's
                                               (continued...)

The remote element is made up of one or more computer units physically located remotely from the user.[16]  The remote element performs the computing functions desired by the user.[17]  Output from the remote element is relayed back to the user via the intermediate element and is displayed or otherwise expressed in a usable format by the local element.[18]  Data is transmitted from one element to another via the internet or other similar connection.[19]

In summary, the invention allows a user "to remotely operate the remote computer unit as if [he] were sitting in front of the remote computer unit and actually operating the remote computer

---

[15](...continued)
local portion with the individual's remote computer unit . . . thereby permitted valid data signals received from each individual's local portion to be transmitted to each individual's remote computer unit"); '943 patent, claim 1 (as amended) ("interfacing, through the remote system controller, the local computer unit with the remote computer unit to permit the local computer unit to operate the remote computer unit"); '943 patent, claim 2 (as amended) ("a network control computer . . . to connect the remote computer unit to the local computer unit permitting the local computer unit to operate the remote computer unit"); '945 patent, claims 3-5 ("receiving, by the website, data signal instructions from the interface unit; and sending the data signal instructions from the website to the remote computer unit whereby the data signal instructions act to remotely operate the remote computer unit").

[16]'253 patent, col.2 ll.27-28; '943 patent, col.2 ll.30-31; see '945 patent, col.6 l.60 - col.7 l.57.

[17]'253 patent, col.2 ll.18-20; '943 patent, col.2 ll.21-23; see '945 patent, col.7 l.58 - col.8 l.7.

[18]'253 patent, col.2 ll.47-58; '943 patent, col.2 ll.50-61; see '945 patent, col.7 ll.58-61.

[19]'253 patent, col.3 l.66 - col.4 l.13, col.5 ll.4-9; '943 patent, col.4 ll.4-17, col.5 ll.9-14; see '945 patent, col.7 ll.58-61.

unit."[20]   Although the user is in one physical location and the computer unit performing the desired computational tasks are in another physical location, the invention provides "the illusion of utilizing a complete personal computer system."[21]

## B.   Procedural History

Plaintiff ABC initiated this action on March 27, 2006, asserting causes of action against multiple defendants, including WebEx, for infringement of claim 16 of the '253 patent, claims 1-5 of the '945 patent, and claims 1 and 2 of the '943 patent.[22]   On June 6, 2006, one of the defendants that is no longer a party to this action filed a request for an <u>ex parte</u> reexamination of the asserted claims of the patents involved in this action in the United States Patent and Trademark Office ("USPTO").[23]   After the USPTO granted the reexamination requests for two of the three patents in suit, the defendants filed a joint motion to stay this action pending the outcome of the reexamination proceedings,[24] which the court granted on September 6, 2006.[25]   Subsequently, other

---

[20]'945 patent, claims 3-5.

[21]'253 patent, col.2 ll.25-26; '943 patent, col.2 ll.28-29.

[22]Original Complaint, Docket Entry No. 1, ¶ 2.4.

[23]ABC's Brief, Docket Entry No. 154, at 4.

[24]Defendants' Joint Motion to Stay, Docket Entry No. 99. <u>See also</u> Joint Motion to Modify Stay, Docket Entry No. 103.

[25]Agreed Order, Docket Entry No. 102.   <u>See also</u> Order, Docket Entry No. 105.

defendants, including WebEx, filed additional ex parte examination requests with the USPTO.[26]   The USPTO granted the reexamination requests and conducted ex parte reexaminations of each of the claims asserted in this action.[27]

During the reexamination of the '253 patent, ABC amended claim 16 to clarify that the "remote system controller" was not a passive device, but instead that it was capable of actively receiving and checking logon commands and actively interfacing the local element and the remote element.[28]   On March 27, 2009, the USPTO completed the ex parte reexamination of the '253 patent, concluding that claim 16, as amended, was patentable.[29]

For the '943 patent, ABC made amendments to claims 1 and 2 similar to the amendments made to claim 16 of the '253 patent.   The

---

[26]ABC's Brief, Docket Entry No. 154, at 4.

[27]See Notice of Intent to Issue Ex Parte Reexamination Certificate, Ex Parte Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (March 27, 2009) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 10, and in WebEx's Brief, Docket Entry No. 156, at Exhibit 4I); Notice of Intent to Issue Ex Parte Reexamination Certificate, Ex Parte Reexamination of U.S. Patent No. 7,016,943, Control No. 90/008,053 (March 27, 2009) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 11, and in WebEx's Brief, Docket Entry No. 156, at Exhibit 5F); Notice of Intent to Issue Ex Parte Reexamination Certificate, Ex Parte Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (March 30, 2009) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6J).

[28]Notice of Intent to Issue Ex Parte Reexamination Certificate, at 4-9, Ex Parte Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (March 27, 2009) (describing amendments to claim 16) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 10, and in WebEx's Brief, Docket Entry No. 156, at Exhibit 4I).

[29]Id. at 1-2.

amendments clarified that the "remote system controller" of claim 1
and the "network control computer" of claim 2 are active devices,
not mere passive switches or pass-through devices.[30]  The amendments
made explicit that the claimed "remote system controller" and the
"network control computer" were capable of receiving and checking
logon commands.[31]  On March 27, 2009, the USPTO announced that it
found claims 1 and 2 patentable as amended, concluding the <u>ex parte</u>
reexamination of the '253 patent.[32]

     With regard to the '945 patent, the USPTO concluded that
claims 1 and 2 were not patentable, but that claims 3-5 were
patentable as originally issued.[33]  Although ABC disagreed with the
USPTO's conclusion as to claims 1 and 2, it agreed to cancel
claims 1 and 2 to "expedite the confirmation of patentability of
claims 3-5."[34]  The '945 patent emerged from reexamination on

---

[30]<u>See</u> Notice of Intent to Issue <u>Ex Parte</u> Reexamination
Certificate, at 4, 6, 8-10, <u>Ex Parte</u> Reexamination of U.S. Patent
No. 7,016,943, Control No. 90/008,053 (March 27, 2009)
(describing amendments to claims 1 and 2) (included in ABC's
Brief, Docket Entry No. 154, at Exhibit 11, and in WebEx's Brief,
Docket Entry No. 156, at Exhibit 5F).

[31]<u>Id.</u>

[32]<u>Id.</u> at 1-2.

[33]Final Office Action, at 7, <u>Ex Parte</u> Reexamination of U.S.
Patent No. 6,999,945, Control No. 90/008,122 (Oct. 3, 2008)
(included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6G).

[34]Response to Office Action in Ex Parte Reexamination, at 4-
5, <u>Ex Parte</u> Reexamination of U.S. Patent No. 6,999,945, Control
No. 90/008,122 (Nov. 26, 2008) (included in WebEx's Brief, Docket
Entry No. 156, at Exhibit 6H).

March 30, 2009, with claims 1 and 2 canceled, but with claims 3, 4, and 5 confirmed as patentable without amendment or clarification.[35]

Meanwhile, on November 3, 2008, the parties submitted a Joint Status Report to the court in which ABC requested that the stay in this action be lifted.[36]  On November 4, 2008, the court entered an Order lifting the stay,[37] an Order on Patent Procedures,[38] and entered an amended Docket Control Order.[39]

ABC and WebEx filed their initial claim construction briefs on April 30, 2009.[40]  ABC and WebEx filed their claim construction responses on May 29, 2009.[41]

On June 2, 2009, ABC amended its complaint to, among other things, reflect the fact that claims 1 and 2 of the '945 patent had been canceled during reexamination.[42]  ABC now asserts that WebEx

---

[35]See Notice of Intent to Issue Ex Parte Reexamination Certificate, Ex Parte Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (March 30, 2009) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6J).

[36]Joint Status Report, Docket Entry No. 125.

[37]Order, Docket Entry No. 128.

[38]Order on Patent Procedures, Docket Entry No. 127.

[39]Amended Docket Control Order, Docket Entry No. 126.

[40]ABC's Brief, Docket Entry No. 154; WebEx's Brief, Docket Entry No. 156.

[41]ABC's Response, Docket Entry No. 165; WebEx's Response, Docket Entry No. 166.

[42]See First Amended and Supplemental Complaint, Docket Entry No. 171.

-9-

has infringed and continues to infringe claim 16 of the '945 patent, claims 3-5 of the '945 patent, and claims 1 and 2 of the '943 patent.[43]  WebEx asserts multiple affirmative defenses, including invalidity of the asserted patents, and has filed a counterclaim seeking a declaratory judgment that the asserted patents are unenforceable.[44]  Before the claims and defenses of the parties can be resolved on the merits, however, the court must construe several disputed claim terms.

## II.  Legal Standard for Claim Construction

In Markman the United States Supreme Court held that the construction of patent claims is a matter of law exclusively for the court. Markman, 116 S. Ct. 1384, 1387 (1996).  Accordingly, when the parties dispute the meaning of particular claim terms, the court should consider the parties' proposed definitions, but must independently assess the available evidence and declare the meaning of the disputed terms. Exxon Chemical Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1556 (Fed. Cir. 1995).

The court should begin its claim construction inquiry by ascertaining the "ordinary and customary meaning" of the disputed claim terms. Phillips v. AWH Corporation, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  Claim terms "'are generally given

---

[43]Id. ¶ 4.2.

[44]WebEx's Answer and Counterclaims to ABC's First Amended and Supplemental Complaint, Docket Entry No. 186.

-10-

their ordinary and customary meaning,'" <u>id.</u> at 1312 (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), and at the very least, the ordinary and customary meaning "provides an objective baseline from which to begin claim interpretation." <u>Id.</u> at 1313.  <u>See also</u> <u>CCS Fitness, Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("There is a 'heavy presumption' that a claim term carries its ordinary and customary meaning." (quoting <u>Johnson Worldwide Associates, Inc. v. Zebco Corp.</u>, 175 F.3d 985, 989 (Fed. Cir. 1999))).  The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." <u>Phillips</u>, 415 F.3d at 1313.

Although ascertaining a term's ordinary and customary meaning is the "starting point" for claim construction, it may not be the ending point. <u>Id.</u>  A claim term may convey a meaning other than its ordinary and customary meaning in several situations.  For example, a term may not carry its ordinary and customary meaning "if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." <u>CCS Fitness, Inc.</u>, 288 F.3d at 1366.  Additionally, a claim term may be interpreted more narrowly than it otherwise would if "the patentee distinguished the term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular

-11-

embodiment as important to the invention." Id. at 1366-67. A
claim term may also be construed to communicate something other
than its ordinary meaning if the term, given its ordinary meaning,
would "'so deprive the claim of clarity'" that evidence other than
the claim language itself must be considered to ascertain the scope
of the claim. Id. at 1367 (citing Gart v. Logitech, Inc., 254 F.3d
1334, 1341 (Fed. Cir. 2001); Johnson Worldwide, 175 F.3d at 990).

     There are two types of evidence upon which courts may rely
in making claim construction rulings:  (1) intrinsic evidence
(e.g., the language of the claim itself, the patent specification,
and the prosecution history of the patent) and (2) extrinsic
evidence (e.g., dictionaries, treatises, and expert and inventor
testimony). Vitronics Corp., 90 F.3d at 1582-83. The court is not
required to consider the available evidence, whether it be
intrinsic or extrinsic, in any particular order. Phillips, 415
F.3d at 1324. What is important is for the court "to attach the
appropriate weight" to particular evidentiary sources in accordance
with patent law principles. Id. Intrinsic evidence is the "most
significant source of the legally operative meaning of disputed
claim language," and in most cases the court can resolve any
ambiguity in a disputed claim term by looking solely to the
intrinsic evidence. Vitronics Corp., 90 F.3d at 1582-83. The
court may also consider extrinsic evidence, but only "as long as
those sources are not used to contradict claim meaning that is
unambiguous in light of the intrinsic evidence." Phillips, 415

F.3d at 1324.  See also Vitronics Corp., 90 F.3d at 1583 (explaining that "it is improper to rely on extrinsic evidence" when "the intrinsic evidence, alone, will resolve any ambiguity in a disputed claim term").

**A.    Intrinsic Evidence**

The language of the claim itself is "'of primary importance[] in the effort to ascertain precisely what it is that is patented.'" Phillips, 415 F.3d at 1312 (quoting Merrill v. Yeomans, 94 U.S. 568, 570 (1876)).  This is because it is the claims that "'define the scope of the right to exclude.'"  Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002) (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).

The court should carefully consider the context within which a particular term is used in an asserted claim, as well as how the term is used in other claims within the same patent.  See Phillips, 415 F.3d at 1314-15.  "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Id. at 1314.

While the claim language itself should be the court's primary focus, other intrinsic sources can be helpful.  For example, the written description, or specification, can provide clarity.  SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d

1337, 1344 (Fed. Cir. 2001).  The claims "must be read in view of the specification of which they are a part." <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995).  The specification is "highly relevant to the claim construction analysis" and can be the "single best guide to the meaning of a disputed term." <u>Vitronics Corp.</u>, 90 F.3d at 1582.  The specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." <u>Phillips</u>, 415 F.3d 1316; <u>see</u> <u>also</u> <u>CCS Fitness, Inc.</u>, 288 F.3d at 1366 (explaining that a patentee may "act[] as his own lexicographer").  Moreover, the specification may "make[] clear that the invention does not include a particular feature . . . ." <u>SciMed Life Sys., Inc.</u>, 242 F.3d at 1341.  In that case, the particular feature "is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  <u>Id.</u>

Importantly, however, the specification is generally to be used only to <u>interpret</u> the meaning of a claim, not to confine patent claims to the specific embodiments of the invention described in the specification.  See <u>Phillips</u>, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); <u>Dow Chem. Co.</u>

-14-

v. United States, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000) ("[A]s a general rule claims of a patent are not limited to the preferred embodiment, or to the examples listed within the patent specification.") (citations omitted).   Only if the patentee describes a particular embodiment as "important to the invention" may the court narrow the meaning of a claim to a single or preferred embodiment.  Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1301 (Fed. Cir. 1999); see also CCS Fitness, Inc., 288 F.3d at 1366-67.

The patent's prosecution history is also considered intrinsic evidence of the meaning of disputed claim language, and should be considered if it is offered as evidence.  Phillips, 415 F.3d at 1317.  The prosecution history includes the record of all communication with and proceedings before the USPTO, as well as the prior art cited during patent examination.  Id.  Similarly, all communications with the USPTO and prior art cited during a reexamination proceeding are considered part of the patent's prosecution history. See C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 867-68 (Fed. Cir. 2004) (considering communications with the USPTO during a reexamination proceeding as prosecution history for claim construction purposes).

The prosecution history may illustrate how the inventor understood the invention during prosecution.  See Philips, 415 F.3d at 1317.  Moreover, the inventor may have narrowed the meaning of a claim term by distinguishing the term from prior art or

-15-

disclaiming a particular interpretation or particular subject matter. <u>See</u> <u>id.</u>; <u>CCS Fitness, Inc.</u>, 288 F.3d at 1366-67. Nevertheless, because the prosecution history is the product of ongoing negotiations between the inventor and the USPTO, "it often lacks the clarity of the specification and is thus less useful for claim construction purposes." <u>Phillips</u>, 415 F.3d at 1317.

**B.    Extrinsic Evidence**

If the available intrinsic evidence does not resolve the ambiguity in a particular claim term, the court may look to the available extrinsic evidence to help it reach a conclusion as to the term's meaning. <u>See</u> <u>Phillips</u>, 415 F.3d at 1324; <u>Vitronics Corp.</u>, 90 F.3d at 1583. The court may look to dictionaries, especially technical dictionaries, and treatises if the court "deems it helpful in determining 'the true meaning of language used in the patent claims.'" <u>Phillips</u>, 415 F.3d at 1318 (quoting <u>Markman</u>, 52 F.3d at 980). The court, however, must always be mindful that extrinsic evidence may only supplement or clarify -- not displace or contradict -- the intrinsic evidence. <u>See</u> <u>id.</u> at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."). "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term

to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  Id.

### III.  Construction of Disputed Claim Terms

ABC urges the construction of ten terms used in the claims of the '945, '253, and '943 patents: (1) "website," (2) "logon command," (3) "associates the valid logon command with the remote computer unit," (4) "billing for access to the service" and "generating a bill for services," (5) "monitoring payments," (6) "remote system controller," (7) "network control computer," (8) "established on the World Wide Web," (9) "video signals," and (10) "split personal computer system."[45]  WebEx disputes ABC's construction of these ten terms and also asks the court to define one additional term:  "valid logon command."[46]

The court addresses each disputed term below.  Several of the disputed terms appear multiple times in the same claim, in multiple claims in the same patent, and/or in multiple patents.  Unless indicated otherwise, a term has the same meaning within each individual patent and across multiple patents.  See Phillips, 415 F.3d at 1314-15 ("[C]laim terms are normally used consistently throughout the patent . . . ."); NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1293 (Fed. Cir. 2005) (indicating that claim

---

[45]ABC's Brief, Docket Entry No. 154.

[46]WebEx's Brief, Docket Entry No. 166.

-17-

terms are typically interpreted consistently across related patents).

The effective filing date for all of the asserted patents is the original filing date for the common parent patent -- January 29, 1998. See 35 U.S.C. § 120. Therefore, where appropriate, the court will seek to determine the "ordinary and customary meaning" of the disputed terms as of that date. See Phillips, 415 F.3d at 1313.

A.    "Website"

The term "website" appears in the '945 patent in all three of the asserted claims -- claims 3, 4, and 5.[47] ABC asserts that "website" means "one or more servers operating together, that can be provided by a service provider, that can be located on the Internet by use of a Uniform Resource Locator ("URL"), and which can perform services including hosting web pages, validating logon commands and sending, receiving, and processing instructions."[48] WebEx contends that "website" means "a collection of related Web

_____

[47]The term "website" literally appears only in claims 1, 2, and 5 of the originally issued version of the '945 patent. Claims 3, 4, and 5, however, are written in dependent form. Claim 3 depends on claim 2, which itself depends on claim 1. Claims 4 and 5 depend on claim 1. As explained above, ABC canceled claims 1 and 2 during reexamination, but claims 3, 4, and 5 survived reexamination without amendment. Therefore, the text of claims 1 and 2, including the term "website," remains part of the '945 patent because it is incorporated by dependent claims 3, 4, and 5.

[48]ABC's Brief, Docket Entry No. 154, at 11.

-18-

pages maintained by a Web server and retrievable by a Web browser using hypertext transfer protocol ("HTTP") and Hypertext Markup Language ("HTML") interpretation."[49] WebEx further asserts that the claims of the '945 patent must be interpreted to require that the same "website" both receive valid logon commands and receive and send the data that control the remote computer unit.[50]

### 1. Web Pages or Servers

The first question raised by the parties' proposed constructions is whether a website is a collection of web pages hosted or maintained by a server or servers, or whether a website consists of the server or servers themselves. In support of its position that the term website refers to servers, ABC points out that the claim language (intrinsic evidence) requires that the website claimed in the '945 patent be able to carry out a number of functions: (1) "allowing and facilitating communication between a remote computer unit and an interface unit via an internet,"[51] (2) "receiving . . . a valid logon command,"[52] (3) "associat[ing] the valid logon command with the remote computer unit,"[53] (4) "receiving . . . data signal instructions from the interface

---

[49]WebEx's Brief, Docket Entry No. 156, at 16.

[50]Id.

[51]'945 patent, claim 1.

[52]Id.

[53]Id.

unit,"[54] (5) "sending the data signal instructions . . . to the remote computer unit,"[55] and (6) "downloading a program . . . to the remote computer unit."[56]  ABC argues and submits an affidavit from a purported person of skill in the art stating that web pages, alone, are unable to carry out these functions.  Therefore, the term "website" must be understood to refer to a server or collection of servers, which could conduct these functions.[57]

Because ABC's argument is based on the claim language itself, the court finds it very persuasive.  See Phillips, 415 F.3d at 1312 (explaining that the claim language itself is "'of primary importance'" in the claim construction process (quoting Merrill, 94 U.S. at 570)).  Moreover, WebEx does not make any counter-arguments based on the claim language itself in support of its position.  Nor does it attempt to controvert ABC's assertion that web pages alone cannot perform the functions attributed by the claim language to the website.  Instead, WebEx argues only that the ordinary and customary meaning of the term in 1998 encompassed only web pages.

_____

[54]Id.

[55]Id.  See also '945 patent, claim 2 ("data signal instructions sent by the website to the remote computer unit . . .").

[56]'945 patent, claim 5.

[57]See ABC's Brief, Docket Entry No. 154, at 12; Affidavit of Ivan Zatkovich, ¶¶ 7-10 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

-20-

WebEx is unable to muster any persuasive intrinsic evidence to support its position, relying only on prosecution history references.[58]  See Phillips, 415 F.3d at 1317 (explaining that a patent's prosecution history "often lacks clarity . . . and thus is less useful for claim construction purposes" than other forms of intrinsic evidence).  WebEx first directs the court to two patents cited as prior art during the prosecution of the '945 patent.  The first prior art patent states:  "In the preferred embodiment, a web site or 'home-page' is constructed on a secure HTTP . . . server

---

[58]The court acknowledges that WebEx had very little intrinsic evidence to work with.  The original application for the '945 patent did not include any claims reciting the term "website."  See Original Patent Application for '945 Patent, at 31, 36 (Sept. 30, 1999) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6A).  Moreover, the term "website" does not appear anywhere in the specification of the '945 patent.  See '945 patent.  The originally proposed claim language and the specification speak only in terms of a "computer service control unit" facilitating the connection between the local and remote elements.  ABC did not propose claim language including the term website until July of 2004, almost five years after the application for the '945 patent was filed and over six years after the patent's effective filing date.  See Response to Office Action Dated February 4, 2004, at 13 (July 13, 2004) (proposing a new claim, numbered 22, that would eventually become claim 1).  Moreover, when ABC finally proposed the claim language including the term "website," ABC did not attempt to define the term or explain how the utilization of a website was supported by the patent specification.  See id. at 25-28 (discussing the new proposed claims).  In light of this history, WebEx suggests that the asserted claims of the '945 patent are invalid because the website limitation is not supported by the written description, as required by 35 U.S.C. § 112, ¶ 1.  WebEx further states that it intends to file a motion for summary judgment on this issue at some point in the future.  WebEx's Brief, Docket Entry No. 156, at 17.  Because the issue is not yet ripe for review, the court does not now decide whether the specification supports the website limitation found in the asserted claims.

. . . ."[59]  The second patent states:  "A 'web site' on a web server
20 contains one or more web pages where a 'base' or 'home' page is
the first or entry page into a desired web site."[60]   These
references indeed equate a website with a web page, not a server.
These unrelated patents, however, do not give the court the same
insight into how the '945 patent inventor understood the term
website as the text of the '945 patent itself does.

     WebEx also points to statements made by the USPTO Examiner
who conducted the reexamination of the '945 patent.  In the Final
Office Action for the '945 patent reexamination, the Examiner
explained his reasons for concluding that claims 1 and 2 of the
'945 patent were invalid as anticipated by a particular prior art
reference.[61]   Quoting a document describing the prior art

---

[59]United States Patent No. 6,138,150 col.3 ll.4-6 (filed
Sept. 3, 1997) (included in WebEx's Brief, Docket Entry No. 156,
at Exhibit 14).  This patent was cited during the prosecution of
the '945 patent in an Information Disclosure Statement submitted
to the Examiner by ABC.  See Information Disclosure Statement by
Applicant (Apr. 20, 2005) (included in WebEx's Brief, Docket
Entry No. 156, at Exhibit 6E).

[60]United States Patent No. 7,007,070 col.8 ll.65-67 (filed
Feb. 28, 1997) (included in WebEx's Response, Docket Entry No.
166, at Exhibit 15).  This patent was cited during the ex parte
reexamination of the '945 patent in a Response to Office Action.
See Response to Office Action in Ex Parte Reexamination, at 8-10,
Ex Parte Reexamination of U.S. Patent No. 6,999,945, Control
No. 90/008,122 (Feb. 19, 2008) (included in WebEx's Brief, Docket
Entry No. 156, at Exhibit 6I).

[61]See Final Office Action, at 10, Ex Parte Reexamination of
U.S. Patent No. 6,999,945, Control No. 90/008,122 (Oct. 3, 2008)
(included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6G).

technology, the Examiner explained that the prior art enabled a user to "'control another computer o[r] transfer files over the Internet by initiating [a] connection from any Web browser via HTML hotlinks,' which inherently utilizes a website."[62]  The Examiner also stated that the prior art reference "discloses the use of hot-links in a web browser," and concluded that

> [a] page in the web browser utilizing hot-links described in the [prior art reference] would fall under the rubric of what one of ordinary skill would have considered a 'website,' a broad reasonable interpretation consistent with the Patent specification . . . given the lack of description of a 'website' in the Patent's specification.[63]

ABC submitted a response to this office action in which it stated that it

> agrees with the Examiner's statements regarding the proper interpretation of the term "website" and agrees with the Examiner's conclusion that such interpretation is consistent with the specification.  Particularly, the Patent Owner agrees with the Examiner's statement that '[]any system that utilizes a website to connect the two computer systems reads on the instant limitations even if the actual controlling data is sent via another route.' . . . The Patent Owner also agrees with the Examiner's statement that this '[]broad interpretation of "website" is consistent with the specification and the requirement that the Examiner give each claim term its broadest reasonable construction consistent with the specification.'[64]

---

[62]_Id._ at 7 (quoting a document referred to by the Examiner as "Symantec Ships").

[63]_Id._ at 10.

[64]Response to Office Action in Ex Parte Reexamination, at 5, _Ex Parte_ Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (Nov. 26, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6H).

WebEx argues that these documents show that both the Examiner and ABC were in agreement that a website is a web page retrievable by or viewable in a web browser.  The court is not persuaded by WebEx's argument.  Although the Examiner's statements could be interpreted to indicate that he understood the term website to encompass a web page or pages, they do not foreclose the possibility that the Examiner considered the term to refer to a server or servers hosting a web page or pages.  It is not clear whether the Examiner thought the page in a web browser was itself the website or whether  the server or servers that provided the functionality of the hot-links on the page constituted the website. Moreover, the Examiner made clear that he was interpreting the term website very broadly.  Thus, it is not at all clear that the Examiner understood the term website to exclude servers that host or are otherwise associated with web pages.

As for ABC's statements expressing its agreement with the Examiner's interpretation, the court understands these statement only to express agreement that the term "website" should be interpreted as broadly as possible consistent with the specification.  More importantly, the court does not conclude that ABC disclaimed servers as within the scope of the term website.  In conclusion, the court finds that the intrinsic evidence more strongly supports ABC's position that a website is one or more servers, as opposed to merely one or more web pages hosted on a server.

-24-

Turning to the extrinsic evidence, WebEx cites three dictionary definitions dating from 1999 and 2000. Two of the definitions are from general purpose dictionaries, which define the term website as "a set of interconnected webpages, usually including a homepage, generally located on the same server,"[65] and "[a] group of related Web pages,"[66] respectively. These definitions are consistent with WebEx's position, but because the Federal Circuit has warned courts not to rely on "non-scientific dictionaries for defining technical words," AFG Indus., Inc. v. Cardinal IG Co., Inc., 239 F.3d 1239, 1247-48 (Fed. Cir. 2001), the court does not find them persuasive.

WebEx also cites a technical dictionary that defines a website as "a group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web. . . . Most Web sites have a home page as their starting point, which frequently functions as a table of contents for the site."[67] Although this definition suggests that a person of skill in the art may have understood a website to consist of more than just web pages, encompassing "scripts" and "databases" as well, the definition clearly does not include servers within the

---

[65]The American Heritage Dictionary of the English Language 1949 (4th ed. 2000) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 11).

[66]Encarta World English Dictionary 2012 (1999) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 13).

[67]Microsoft Computer Dictionary 479-80 (4th ed. 1999) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 10).

scope of the term.  Instead, the definition characterizes a server as something separate that "serve[s] up" the website.  Therefore, this definition tends to support WebEx's position.

ABC, however, cites a treatise published in 1997 that defines the term "web site" as a "server that serves the WWW [World Wide Web]."[68]  Additionally, ABC cites the deposition testimony of Srinath Anantharaman, a former WebEx engineer who was the named inventor for a patent application that WebEx filed for its allegedly infringing products.  During Mr. Anantharaman's deposition he was asked to define HTTP.  That question led to the following exchange:

> A.   That's typically the protocol that's used by web sites to communicate with web browsers.
>
> Q.   So the central computer system would be implemented as a web site under the invention?
>
> MR. PANKRATZ:  Objection.  Mischaracterizes his testimony.
>
> THE WITNESS:  Don't know what you mean by web site, but yes, there is a web site that you go to and behind that, is, you know, other servers which are maybe not typically considered part of the web site.
>
> MR. POTTS:   Well, what is a web site?
>
> A.   It's a very broad term.  So a web site, most people would be a machine or a set of machines which host a web server which basically gives you web pages as you ask for it.  So that's typically what you would think of as a web site.

---

[68]David W. Brooks, Web-Teaching: A Guide to Designing Interactive Teaching for the World Wide Web 190 (1997) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 15).

> Q.   That's what the uninitiated would think of as a web
>      site?
>
> A.   That's what most people would think of as a web
>      site.
>
> Q.   People  who  create  web  sites,  though,  would
>      understand that a web site also includes the other
>      servers,  the  application  servers,  the  database
>      servers,  the  communication  servers,  all  of  which
>      provide  the  information  through  the  web  server,
>      which  can  then  be  accessed  over  the  internet,
>      correct?
>
> A.   Certainly.   And how a web site is implemented is
>      very wide and different.[69]

The treatise and deposition testimony cited by ABC reflects that
one of ordinary skill in the art would understand a website to
consist of servers, not merely web pages.

The extrinsic evidence is mixed.  It suggests that a person of
skill in the art in 1998 could have understood the term website to
refer <u>either</u> to a web page or collection of web pages, or to the
servers that host web pages.  As discussed above, however, the
<u>intrinsic</u> evidence in the record would inform one of skill in the
art that the inventor of the '945 patent intended the term to refer
to a server or servers, and not merely web pages.  The court
therefore construes website to refer to one or more servers.

2.   <u>Web Servers, One or More Servers</u>

The parties further dispute whether the term website, to the
extent it refers to a server or servers, refers only to a single

---

[69]Videotaped Deposition of Srinath Anantharaman, at 114-15
(May 21, 2009) (included in ABC's Response, Docket Entry No. 165,
at Exhibit 28).

-27-

web server, or whether it refers to web server(s) <u>and</u> any other server(s) required to carry out all of the services provided by the website.[70]   WebEx's proposed definition limits the website to a single web server.[71]   ABC, on other hand, argues and presents evidence indicating that many websites, even as early as 1998, provided services beyond simply hosting static web pages and, therefore, required more than just a web server to operate.[72] Therefore, ABC suggests that one of ordinary skill in the art would have understood the term website to encompass more than just a web server.   ABC also argues that the '945 patent claims explicitly require that the "website" be able to conduct a number of different functions, which include, <u>inter alia</u>, receiving and checking logon commands, receiving and sending data signal instructions, and downloading a program.[73]   Therefore, according to ABC the server or servers that make up the claimed website must be able to carry out all of these functions and, thus, cannot be limited only to a single web server.

The court finds ABC's arguments persuasive.   The claimed website performs multiple functions besides hosting or serving web pages.   Therefore, limiting the server or servers that make up the

---

[70]From the totality of the briefing it appears that the parties agree that a "web server" is a server that serves web pages.

[71]<u>See</u> WebEx's Brief, Docket Entry No. 156, at 16.

[72]<u>See</u> ABC's Response, Docket Entry No. 165, at 2-6.

[73]<u>See</u> <u>id.</u> at 2.

-28-

website only to a single web server, i.e., a server that merely serves web pages, would go against the plain language of the claim. See Phillips, 415 F.3d at 1312 (explaining that the claim language itself is "'of primary importance'" in the claim construction process (quoting Merrill, 94 U.S. at 570)). Similarly, because the website must perform multiple functions, limiting the number of servers to only one would seem inconsistent with the claim language. Moreover, WebEx's own corporate representative who gave deposition testimony on behalf of the corporation admitted that while many simple websites could operate with only a single web server, at least some websites -- including some commercial websites that have been in operation since around the effective filing date of the '945 patent -- require multiple and different types of servers to operate.[74]

WebEx does not deny that, generally speaking, websites may consist of or utilize more than one server. WebEx contends, however, that ABC disclaimed the concept of multiple servers during the reexamination of the '945 patent to overcome a rejection based on certain prior art references.[75]  See Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1374 (explaining that "'a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution'" (quoting

---

[74]See Deposition of Jeff Luo, at 141-144 (May 22, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit 26).

[75]See WebEx's Response, Docket Entry No. 166, at 12-13.

Purdue Pharma L.P. v. Endo Pharms., Inc., 438 F.3d 1123, 1136 (Fed. Cir. 2006))).

During the reexamination of the '945 patent, the Examiner initially rejected claims 1-4 of the '945 patent as obvious in light of the combination of two prior art references, referred to as "Konrad" and "Broadway."[76]   In the Office Action stating the rejection of claims 1-4, the Examiner stated that an element of the Konrad reference known as the "starter server," like the website in the claimed invention, performed the functions of receiving a valid logon command and associating the valid logon command with a remote computer unit.[77]   ABC did not dispute this statement, but argued that Konrad's "starter server" could not read onto the claimed website because it did not also perform the functions of receiving data signal instructions from the interface unit and sending the data signal instructions onto the remote computer unit, as required by claim 1.  As ABC explained, "the starter serv[er] . . . sends commands and software to the remote hosts allowing the remote hosts to connect directly to the local hosts over the network.   The connection over the network allows the local host to operate the remote host."[78]   In other words, ABC argued that Konrad's starter

---

[76]See Response to Office Action in Ex Parte Reexamination, at 10, Ex Parte Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (Feb. 19, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6I).

[77]Id. at 11.

[78]Id. (emphasis added).

-30-

server merely initiated the connection between a local element and a remote element.  Once the local and remote elements were connected, the starter server did not continue to manage and facilitate the connection by receiving and sending data signal instructions like the claimed website in the '945 patent.  Once connected, the local element and the remote element interfaced directly with each other.  According to ABC, there was no intermediate element comparable to the website in the '945 patent.

WebEx argues that the "starter server" in Konrad received the logon commands and initiated the connection between the remote and local elements, and then the "network" took over to facilitate the connection.  Therefore, WebEx contends that the starter server and the network referenced in Konrad are essentially two "servers," which together could make up a "website" if described in the terminology of the '945 patent.  Furthermore, according to WebEx, because ABC differentiated its invention from Konrad on the basis that Konrad's starter server did not both initiate and then continue to facilitate the connection between the remote and local elements, ABC limited its claimed website to being composed of only a single server.

WebEx's argument is not persuasive.  Nothing suggests that the "network" described in Konrad is at all comparable to a "server" in ABC's definition of website.  The available evidence instead suggests that the "network" in Konrad did nothing more than passively conduct data signals from the local to the remote

-31-

element.  In fact, ABC described the network as a mere conduit for a <u>direct</u> connection between the local and remote element.  The '945 patent, on the other hand, requires the claimed website, which is made up of one or more servers, to <u>actively</u> manage and facilitate the connection between the remote and local elements.

The court concludes that ABC differentiated its claimed invention from Konrad not because it described one "server" (the "starter server") that initiated a connection and another "server" (the "network") that continued to actively manage and facilitate the connection, but instead, that ABC differentiated Konrad from the claimed invention because in Konrad <u>nothing</u> continued to actively manage and facilitate the connection after the starter server initiated it.  Therefore, ABC did not clearly and unmistakably disavow any website that utilized more than one server to perform multiple functions.  <u>See</u> <u>Computer Docking Station Corp.</u>, 519 F.3d at 1374.

   3.   <u>Hosting Web Pages, Retrievable by a Web Browser Using HTTP and HTML Interpretation</u>

Under ABC's definition a website "can perform services including hosting web pages . . . ."  Therefore, under ABC's definition, a website need only be capable of hosting web pages, but need not necessarily do so.  ABC's definition is silent as to whether the web pages hosted by websites must be retrievable by a web browser and as to whether the web pages must be retrievable using HTTP and HTML interpretation.

-32-

Under WebEx's proposed definition a website is made up of "Web pages maintained by a Web server and retrievable by a Web browser using [HTTP] and HTML interpretation."  Therefore, WebEx suggests that a website must involve web pages, that those pages must be retrievable by a web browser, and that the protocol and programming language used are limited to HTTP and HTML, respectively.

    a.   Hosting Web Pages

The only evidence in the record that supports ABC's contention that a website need not involve web pages is a statement in the affidavit of ABC's expert (extrinsic evidence):  "In fact, a website is not even required to maintain any web pages."[79]  However, the source cited by the expert as allegedly supportive of this statement describes only websites that have web pages.

The World Wide Web, A Mass Communications Perspective, by Kaye and Medoff, describe five types of commercial websites.[80]  Each type of website described clearly utilizes web pages.  In fact, several example web pages displayed in web browser windows are depicted.  Therefore, the court is not persuaded by ABC's expert's affidavit.

The other relevant evidence in the record -- both intrinsic and extrinsic -- suggests that websites necessarily involve web

---

[79]Affidavit of Ivan Zatkovich, ¶ 10 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

[80]See Barbara K. Kaye & Norman J. Medoff, The World Wide Web, A Mass Communications Perspective, at 188-90 (1999) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 14).

pages.   As stated above, some intrinsic and extrinsic evidence actually equates the term website with the web pages themselves.[81] Although the court concluded that a website, as the term is used in the '945 patent, consists of one or more servers, as opposed to web pages, the evidence nevertheless strongly suggests that a website necessarily involves or is somehow related to web pages. Accordingly, the court concludes that a website must host one or more web pages.

   b.   Retrievable by a Web Browser

   The evidence in the record also suggests that web pages hosted by a website must be retrievable by a web browser.   For example, one prior art patent cited during the prosecution of the '945 patent states that "[t]he WWW [World Wide Web] is a collection of files written using [HTML], commonly referred to as 'Web pages.' HTML files may be accessed and displayed using specialized

---

[81]See United States Patent No. 6,138,150 col.3 ll.4-6 (filed Sept. 3, 1997) ("In the preferred embodiment, a web site or 'home-page' is constructed on a secure HTTP . . . server . . . .") (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 14); United States Patent No. 7,007,070 col.8 ll.65-67 (filed Feb. 28, 1997) ("A 'web site' on a web server 20 contains one or more web pages where a 'base' or 'home' page is the first or entry page into a desired web site.") (included in WebEx's Response, Docket Entry No. 166, at Exhibit 15); Microsoft Computer Dictionary 479-80 (4th ed. 1999) (defining a website as "a group of related HTML documents and associated files, scripts, and databases that is served up by an HTTP server on the World Wide Web. . . . Most Web sites have a home page as their starting point, which frequently functions as a table of contents for the site") (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 10).

applications known as 'web' browsers . . . ."[82] Another cited prior art patent states that "Web pages are typically accessed using an HTML compatible browser . . . ."[83]  Similarly, the <u>Microsoft Computer Dictionary</u> (extrinsic evidence), which defines website as a collection of web pages, states in the definition of website that "[u]sers need a Web browser . . . to access a Web site."[84]

Moreover, ABC has not produced any evidence to show or give examples of web pages that are not retrievable by a web browser. Accordingly, the court concludes that a website, by definition, hosts one or more web pages that are retrievable by a web browser.

c.    HTTP and HTML

WebEx asserts that one of ordinary skill in the art in 1998 would have understood the term website to connote the use of HTTP and HTML, but not other protocols or languages.  Alternatively, WebEx asserts that ABC disclaimed other protocols and languages

---

[82]United States Patent No. 5,961,586 col.1 ll.15-21 (filed May 14, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 8).  This patent was cited during the prosecution of the '945 patent in a supplemental disclosure.  <u>See</u> Second Supplemental Disclosure (Oct. 23, 2000) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6B).

[83]United States Patent No. 6,167,441 col.1 ll.22-25 (filed Nov. 21, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 9).  This patent was cited during the prosecution of the '945 patent in a Notice of References Cited.  <u>See</u> Notice of References Cited (May 27, 2003) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6C).

[84]<u>Microsoft Computer Dictionary</u> 480 (4th ed. 1999) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 10).

during the reexamination of the '945 patent in an attempt to distinguish the claimed invention from prior art, and therefore, narrowed the scope of the term. ABC denies that websites, now or in 1998, are or were limited to using HTTP and HTML. ABC also denies that it ever represented that the term "website," as used in the '945 patent, was limited only to the use of HTTP and HTML.

The parties cite multiple references that allegedly support their respective interpretations. The court, however, need not analyze these in detail because the court agrees with WebEx that ABC disclaimed other protocols and languages during the reexamination of the '945 patent, limiting the term website only to HTTP and HTML.

As explained above, during the reexamination of the '945 patent the Examiner concluded that claims 1 and 2 of the '945 patent were anticipated by a prior art reference that utilized hot-links in a web browser.[85] In response ABC submitted an affidavit by a purported expert, Dr. Alan H. Jones, Ph.D., who distinguished the prior art reference by explaining that clicking on a hot-link in a web browser could trigger a number of actions, including

    a)   retrieval of a web page from a <u>website</u> through [HTTP] and HTML interpretation (emphasis added);

    b)   initiation of a directory listing and file transfer from a remote FTP server using FTP protocols and formats;

---

[85]Supplemental Response to Office Action in Ex Parte Reexamination, at 4, <u>Ex Parte</u> Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (Sept. 16, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6F).

> c)   activation of an external program operating
>       independently of the browser to retrieve and
>       interpret data using streaming formats (e.g.
>       RealPlayer window using Real Time Streaming
>       Protocol (RTSP) and interpreting RealAudio format);
>       or
>
> d)   activation of a browser plug-in to fetch and
>       interpret multimedia data to be displayed within a
>       child window of the browser (e.g. Macromedia flash
>       player plug-in using Real Time Messaging Protocol
>       (RTMP) and interpreting as ShockWave Flash
>       format).[86]

Dr. Jones then stated that "[t]he use of the term hot link within a web browser, thus, does not unambiguously imply access to a <u>website</u>, as it can also relate to the use of protocols such as FTP, RTSP, or RTMP" (emphasis added).[87]

Dr. Jones differentiated the claimed "website" from the prior art hot-link because the prior art hot-link did not <u>necessarily</u> utilize HTTP and HTML, but could have utilized other protocols or languages.  The clear implication from his statements is that a website, by definition, utilizes HTTP and HTML, while something that does not utilize this protocol and language would not qualify as a website.  Accordingly, because of ABC's "clear and unmistak- able disavowal of scope during prosecution," the website referred to in the claims of the '945 patent is limited to the use of HTTP and HTML.  <u>Computer Docking Station Corp.</u>, 519 F.3d at 1374.

---

[86]Affidavit Under 37 C.F.R. § 1.132 of Dr. Alan H. Jones, Ph.D., ¶ 5 (Sept. 16, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6F).

[87]<u>Id.</u>

-37-

4.   <u>Located on the Internet by Use of a URL</u>

ABC contends that a website must be capable of being located on the Internet by use of a URL.  WebEx counters that "[t]he ability to be located using a URL does not define a website and does not distinguish a website from other entities that can be located by a URL."[88]

Importantly, WebEx does not contend that there are any websites that cannot be located with a URL.  To the contrary, WebEx implicitly concedes that all websites can be located with URLs.  WebEx instead argues that because "other entities" that do not qualify as websites can also be located with URLs, the ability to be located by a URL should not be included in the definition of a website.[89]  This is rather like arguing that a bicycle should be not defined as having two wheels because other vehicles, such as motorcycles, also have two wheels.  Therefore, the court does not find WebEx's argument persuasive.

Moreover, evidence in the file, including evidence presented by WebEx, confirms that websites are inherently locatable using URLs.  For example, a prior art patent cited during the prosecution of the '945 patent states:  "The path to a particular Web server is defined by a Uniform Resource Locator (URL)."[90]  Additionally, the

---

[88]WebEx's Response, Docket Entry No. 166, at 13-14.

[89]<u>Id.</u>

[90]United States Patent No. 6,167,441 col.1 ll.20-22 (filed Nov. 21, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 9).  This patent was cited during the prosecution of
(continued...)

<u>Microsoft Computer Dictionary</u> (extrinsic evidence) defines the term "Web page" as "an HTML file . . . in a particular directory on a particular machine (and thus identifiable by a URL)."[91]  Further, the same dictionary defines the term "Web directory" as "a list of Web sites, giving the URL . . . of each," and, for the term "Web address," the dictionary refers readers to the definition of URL, suggesting the terms are synonymous.[92]

WebEx does not argue that a website is not "located on the Internet."  Indeed, in its argument regarding the term "established on the World Wide Web," WebEx characterizes the WWW as a "subset of devices on the Internet."[93]  Therefore, a website, clearly a part of the WWW, is located on the Internet.

5.   <u>Provided by a Service Provider</u>

ABC asserts that a website inherently "can be provided by a service provider."  ABC points to several passages in the specifi-cation of the '945 patent that  describe the preferred embodiment of the invention.[94]  The first passage reads:  "An example of the

---

[90](...continued)
the '945 patent in a Notice of References Cited.  <u>See</u> Notice of References Cited (May 27, 2003) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6C).

[91]<u>Microsoft Computer Dictionary</u> 479 (4th ed. 1999) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 10).

[92]<u>Id.</u>

[93]WebEx's Response, Docket Entry No. 166, at 14.

[94]ABC's Brief, Docket Entry No. 154, at 12-13.

preferred embodiment would be an Internet service provider operating much like a phone or cable company, in which a large number of customers can be connected from a large number of different locations to a large number of PC's, at a specific location."[95]  The second passage states:  "The customer for example could log onto an internet service provider and could click the mouse arrow on the computer service icon . . . for example and the computer service screen would appear and give the customer several options to select from."[96]

Courts may not limit the invention to the preferred embodiment unless the patentee describes the particular embodiment as "important to the invention." <u>Toro Co.</u>, 199 F.3d at 1301.  ABC has not directed the court to any representation in the specification or prosecution history of the '945 patent suggesting that the ability to be provided by a service provider is important to this invention.  Although the website may be provided by a service provider in some embodiments of the invention, the court is not persuaded that the website must always be adaptable to being provided by a service provider.  Accordingly, the court will not include the service provider limitation in its definition.

6.  <u>Validating Logon Commands and Sending, Receiving, and Processing Instructions</u>

ABC argues that the term website, as used in the '945 patent, must be capable of "validating logon commands and sending,

---

[95]'945 patent, col.4 ll.7-11.

[96]<u>Id.</u> col.6 ll.5-9.

receiving, and processing instructions."  Claim 1 -- upon which the three asserted claims depend -- explicitly states that the website "receiv[es] . . . a valid logon command from the interface unit whereby the website associates the valid logon command with the remote computer unit."[97]   It further states that the website "receiv[es] . . . data signal instructions from the interface unit; and send[s] the data signal instructions . . . to the remote computer unit."[98]   The court agrees that this claim language supports ABC's position that the website must validate logon commands and send and receive instructions.   The claim, however, does not require that the website process these instructions. Therefore, the court's definition will reflect that a website must be able to validate logon commands and send and receive data signal instructions.   The court's definition will not include the requirement that the website process the instructions.

> 7.   <u>The Same Website Both Receives Valid Logon Commands and Receives and Sends the Data Signals that Control the Remote Computer Unit</u>

WebEx contends that the claims of the '945 patent speak in terms of a single website such that the same website must both receive valid logon commands and receive and send the data signals that control the remote computer unit.   ABC, in its response brief, does not dispute this construction, and itself speaks in terms of

---

[97]'945 patent, claim 1.

[98]<u>Id.</u>

-41-

a singular website "capable of . . . receiving a valid logon command, associating the logon with a remote computer unit, receiving data signal instructions, sending the data signal instructions and downloading a program . . . ."[99]  Moreover, such a construction is consistent with plain language of the claims of the '945 patent.  The first use of the term appears in claim 1 and recites, "a website capable of allowing and facilitating communication between a remote computer unit and an interface unit via the internet."[100]  All subsequent references in claim 1 and the remaining dependent claims speak in terms of "the website."[101]  Accordingly, the court agrees that the same website both receives valid logon commands and receives and sends the data signals that control the remote computer unit.

8.  <u>Conclusion</u>

The court concludes that a "website," as the term is used in the '945 patent, is "one or more servers operating together that (1) can be located on the Internet by use of a Uniform Resource Locator (URL), (2) host one or more web pages retrievable by a web browser through hypertext transfer protocol ("HTTP") and hypertext markup language ("HTML") interpretation, (3) validate logon commands, and (4) send and receive data signal instructions."  The

---

[99]ABC's Response, Docket Entry No. 165, at 2.

[100]'945 patent, claim 1.

[101]'945 patent, claims 1, 2, 5.

same website both receives valid logon commands and receives and sends the data signals that control the remote computer unit.

**B.    "Logon Command"/"Valid Logon Command"**

The term "logon command" appears in claim 16 of the '253 patent, claims 1 and 2 of the '943 patent, and claims 3, 4, and 5 of the '945 patent.[102]  The term "logon command" is preceded by the word "valid" where it appears in claims 1 and 2 of the '943 patent, and in claims 3, 4, and 5 of the '945 patent.

ABC asserts that "logon command" means "identifying information, such as a name or data, associated with, and enabling access to, one or more remote computers where the validation is performed by a website, remote system controller, or network control computer."[103]  WebEx contends that "logon command" means "a command that, if valid, establishes a connection with the remote computer unit, thereby enabling operation of the remote computer unit by the local portion."[104]  WebEx also asserts that the term "valid logon command" should be separately construed, and means "a

---

[102]The term "logon command" literally appears only in claim 1 of the originally issued version of the '945 patent.  Claims 3, 4, and 5, however, are written in dependent form and all depend on claim 1.  As explained above, ABC canceled claim 1 during reexamination, but claims 3, 4, and 5 survived reexamination without amendment.  Therefore, the text of claim 1, including the term "logon command," remains part of the '945 patent because it is incorporated by dependent claims 3, 4, and 5.

[103]ABC's Brief, Docket Entry No. 154, at 14.

[104]WebEx's Brief, Docket Entry No. 156, at 21.

'logon command' that has been confirmed by the [remote system controller (Claim 1 of the '943 Patent)]/[network control computer (Claim 2 of the '943 Patent)]/[website (Claim 1 of '945 Patent)] to be valid for establishing a connection to enable remote operation."[105] ABC argues that it is not necessary to separately define "valid logon command."[106]

### 1.   The Constituent(s) of a Logon Command

The parties' proposed definitions do not consistently define what constitutes a logon command.   ABC contends that a logon command consists of "identifying information, such as a name or data, associated with . . . one or more remote computers . . . ." WebEx, on the other hand, begins its definition with the phrase "a command that . . . ."  WebEx therefore seeks to define a logon command based only on its function or purpose -- i.e., "establish[ing] a connection with the remote computer unit, thereby enabling operation of the remote computer unit by the local portion" -- without reference to what constitutes the command.

Since ABC's proposed definition explains what a logon command is, instead of only what a logon command does, it is more helpful

---

[105]WebEx's Response, Docket Entry No. 166, at 15.  WebEx included a revised definition for the term "valid logon command" in its response brief, explaining that the proposed definition of "valid logon command" in its opening brief included a typographical error.   Id.

[106]ABC's Response, Docket Entry No. 165, at 9.

-44-

and informative.  WebEx's definition is circular, defining "logon command" using the term "command."  Moreover, ABC's proposed definition is, for the most part, supported by the specifications and the claim language of the asserted patents.  Therefore, the court is inclined to adopt this portion of ABC's proposed definition, with one significant modification.

The description of the preferred embodiment in the '253 and '943 patents explains that a "logon command" could "either be a set of keyboard strokes or a special function key provided on the input unit for this purpose."[107]  The specification of the '945 patent describes other possible examples of logon commands, referring to the use of "authorization code[s],"[108] "personal Identification Number[s] (PIN),"[109] and "password code[s] . . . such as data, finger and voice prints . . . ."[110]  This indicates that a logon command consists of identifying information, such as a name or other data.

The language of the asserted claims indicates that this identifying information is associated with a particular remote computer unit, but not more than one remote computer unit as ABC's proposed definition suggests.  Claim 16 of the '253 patent states

---

[107]'253 patent, col.7 ll.26-28; '943 patent, col.7 ll.31-33.

[108]'945 patent, col.5 l.26.

[109]Id. col.6 ll.14-31.

[110]Id. col.9 ll.17-19.

-45-

that "each of the remote computer units [is] associated with a unique individual," that "each individual is associated with . . . one of the remote computer units," and that the remote system controller, after checking the validity of the logon command, "interface[s] each individual's local portion with the individual's remote computer unit . . . ."[111]  Similarly, claims 1 and 2 of the '943 patent describe the process of connecting a local unit to a single remote computer unit after confirming the validity of a logon command.[112]  Finally, the asserted claims of the '945 patent state that the website "associates a valid logon command with the remote computer unit."[113]

ABC contends that the specifications of the asserted patents describe preferred embodiments in which a logon command could be associated with more than one remote computer unit and, therefore, that the term logon command should be interpreted to account for that possibility.[114]  But even if ABC correctly characterizes the specification, the claim language itself for each of the asserted claims speaks in terms of only a single remote computer unit. Therefore, the court's definition of logon command will reflect association with a single remote computer unit.  See Phillips, 415

---

[111]'253 patent, claim 16 (as amended).

[112]'943 patent, claims 1, 2 (as amended).

[113]'945 patent, claims 3, 4, 5.

[114]WebEx's Response, Docket Entry No. 166, at 18-19.

F.3d at 1312 (explaining that the language of the claim itself is
"'of primary importance[] in the effort to ascertain precisely what
it is that is patented'" (quoting Merrill v. Yeomans, 94 U.S. 568,
570 (1876))).  See also TIP Sys., LLC v. Phillips & Brooks/Gladwin,
Inc., 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]he mere fact that
there is an alternative embodiment disclosed in the . . . patent
that is not encompassed by [a] district court's claim construction
does not outweigh the language of the claim, especially when the
court's construction is supported by the intrinsic evidence.").

An extrinsic evidence reference cited by ABC is also
informative.  A technical dictionary defines the term "logon" as
"the process of identifying oneself to a computer after connecting
to it over a communication line.  During a logon procedure, the
computer usually requests the user's name and a password."[115]  This
definition suggests that a logon command consists of the
information or data necessary to identify a particular user to a
particular computer.  Accordingly, the court concludes that the
definition of logon command should include the phrase "identifying
information, such as a name or data, associated with . . . a remote
computer unit . . . ."

2.   The Function of a Logon Command

WebEx contends that the logon command "establishes a
connection with the remote computer unit, thereby enabling

_____

[115]Microsoft Press Computer Dictionary 216 (1991) (included
in ABC's Brief, Docket Entry No. 154, at Exhibit 17).

operation of the remote computer unit by the local portion." ABC asserts that the logon command "enabl[es] access to one or more remote computers . . . ."[116]

The parties agree that the logon command "enabl[es]" something. They disagree, however, as to precisely what the logon command enables. Under ABC's definition, the logon command "enabl[es] <u>access to</u>" a remote computer unit. Under WebEx's definition, the logon command "enabl[es] <u>operation of</u>" a remote computer unit.

The parties also disagree as to whether the logon command, in addition to enabling access to or control of a remote computer unit, "establishes a connection with" the remote computer unit. ABC argues that the remote system controller, network control computer, or website -- depending on which claim is involved -- establishes a connection, not the logon command.

These disagreements can be resolved by a careful reading of the relevant claim language. Claim 16 of the '253 patent describes

> a remote system controller . . . adapted to <u>receive</u>
> remote logon commands, <u>check</u> the remote logon commands
> for validity, and <u>interface</u> each individual's local
> portion with the individual's remote computer unit . . .
> thereby permitting valid data signals received from each
> individual's local portion to be transmitted to each

---

[116]ABC's proposed definition suggests that a logon command may be associated with and enable access to more than one remote computer unit. As noted above, the language of each of the asserted claims speaks in terms of only a single remote computer unit; therefore, the court concludes a logon command enables a connection to only a single remote computer unit.

> individual's remote computer unit . . ., the data signals
> being processable by the individual's remote computer
> unit . . . to generate output signals . . . transmittable
> from the individual's remote computer unit . . . to the
> individual's local portion.[117]

In this claim the remote system controller must be adapted to perform three functions, one of which is to "interface," i.e., establish a connection between, the local portion and the remote computer unit. This function is not performed by the logon command. As for what is enabled by the logon command, this claim does not use either the term "operation" or "access." However, the process of sending data signals to the remote computer unit, processing the signals, and then sending output data back to the local portion, evinces the concept of operation of the remote computer unit, not mere access.

Claim 1 of the '943 patent describes a method, two steps of which are "[1] receiving and checking the validity, by the remote system controller, a valid logon command; and [2] interfacing, through the remote system controller, the local computer unit with the remote computer unit to permit the local computer unit to operate the remote computer unit . . . ."[118] Again, in this claim it is the remote system controller, as opposed to the logon command, that performs the task of "interfacing" or, in other words, establishing a connection between the local computer unit

---

[117]'253 patent, claim 16 (as amended) (emphasis added).

[118]'943 patent, claim 1 (as amended) (emphasis added).

and the remote computer unit.  The claim also explicitly uses the verb "operate" to describe how the local computer unit acts in relation to the remote computer unit.  It is therefore operation, not access, that is enabled by the logon command.

Claim 2 of the '943 patent similarly describes a method, one step of which is "operating a network control computer . . . to connect the remote computer unit to the local computer unit permitting the local computer unit to operate the remote computer unit upon receipt and checking the validity of a valid logon command . . . ."[119]  In this claim the network control computer, not the logon command, performs the function of connecting the local computer unit to the remote computer unit.  Additionally, this claim, like claim 1 of the '943 patent, states that the local computer unit "operate[s]" the remote computer unit.  There is no mention of accessing the remote computer unit.

The three asserted claims of the '945 patent all provide for a "website capable of allowing and facilitating communication between a remote computer unit and a [local] unit . . . ."[120]  The claims further describe "receiving, by the website, a valid logon command . . . whereby the website associates the valid logon command with the remote computer unit . . . ."[121]  In light of this

---

[119]'943 patent, claim 2 (as amended).

[120]'945 patent, claim 1.  Claims 3, 4, and 5 are dependent claims depending on claim 1.

[121]Id.

language, it is clear that the website establishes a connection between the local unit and the appropriate remote computer unit. The logon command does not perform that task.

Elsewhere, the '945 patent claims describe the steps of "receiving, by the website, data signal instructions from the interface unit; and sending the data signal instructions from the website to the remote computer unit whereby the data signal instructions act to remotely <u>operate</u> the remote computer unit . . . ."[122]   Again, the term operate is used, as opposed to access.

In light of the plain language of the asserted patent claims, the court concludes that the logon command enables the operation of, not access to, a remote computer unit by the local portion. The court also concludes that the logon command does not establish a connection with the remote computer unit.   That function is performed by the remote system controller, network control computer, or website, depending on which claim is involved.

3.   <u>Validation of a Logon Command</u>

As the parties' proposed definitions reflect, the parties agree as to which device or element validates a logon command in each of the asserted patent claims.[123]   In claim 16 of the '253

_____

[122]<u>Id.</u> (emphasis added).

[123]<u>See</u> ABC's Brief, Docket Entry No. 154, at 14; WebEx's Response, Docket Entry No. 166, at 15-16.

-51-

patent and claim 1 of the '943 patent the remote system controller validates the logon command.[124]  In claim 2 of the '943 patent the network control computer validates the logon command.[125]  And in the three asserted claims of the '945 patent the website validates the logon command.[126]  The parties disagree, however, as to how this information should be incorporated into the definition(s) of particular terms.

ABC proposes including the following phrase at the end of the definition of logon command:  "where the validation is performed by a website, remote system controller, or network control computer."  WebEx proposes a different method.  WebEx suggests that the court should define the term "valid logon command" separately from the term "logon command," and that "valid logon command" should be defined as "a 'logon command' that has been confirmed by the [remote system controller (Claim 1 of the '943 Patent)]/[network control computer (Claim 2 of the '943 Patent)]/[website (Claim 1 of

---

[124]See '253 patent, claim 16 (as amended) ("a remote system controller . . . adapted to  . . . check the remote logon commands for validity"); '943 patent, claim 1 (as amended) ("receiving and checking the validity, by the remote system controller, a valid logon command").

[125]See '943 patent, claim 2 ("a network control computer . . . to connect the remote computer unit to the local computer unit . . . upon receipt and checking the validity of a valid logon command").

[126]See '945 patent, claim 1 ("receiving, by the website, a valid logon command from the interface unit whereby the website associates the valid logon command with the remote computer unit").

'945 Patent)] to be valid for establishing a connection to enable remote operation."

The court concludes that WebEx's proposed definition of "valid logon command" is circular, confusing, and unnecessary.  It is not helpful to define "valid logon command" as "a 'logon command' that has been confirmed . . . to be valid . . . ."  The proposed definition conveys no information about how the term "valid" modifies the term "logon command."  That is, however, evodently not WebEx's intent.  Apparently, WebEx intends to use this definition as a means to explain which device or element performs the task of validating the logon command for each particular asserted claim. To the extent such information needs to be explained in a definition, it can be explained in the definition of "logon command."  There is no need to arbitrarily select the phrase "valid logon command" as an additional term to define simply to achieve the goal of identifying which element performs the task of validation.  Accordingly, the court will not define the term "valid logon command."  See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . . It is not an obligatory exercise in redundancy.").

The court, however, agrees with WebEx on a different point. WebEx points out that ABC's proposed definition fails to

specifically link the element that performs the logon command validation with the corresponding asserted claim.  This lack of specificity may cause confusion because the asserted claims use different terminology to refer to the intermediate element that performs the validation function.  To avoid any confusion, the definition of "logon command" should be customized for each asserted patent claim to clearly identify the element that performs the logon command validation for that particular claim.  Accordingly, the court concludes that the definition of logon command should conclude with the phrase "and which is checked for validity by the [remote system controller (claim 16 of the '253 patent, claim 1 of the '943 patent)]/[network control computer (claim 2 of the '943 patent)]/[website (claim 1 of '945 patent)]."

    4.   <u>Conclusion</u>

The court concludes that a "logon command" is "identifying information, such as a name or data, associated with and enabling operation of a remote computer unit, and which is checked for validity by the [remote system controller (claim 16 of the '253 patent, claim 1 of the '943 patent)]/[network control computer (claim 2 of the '943 patent)]/[website (claim 1 of '945 patent)]."[127]

---

[127]The court does not include the phrase "if valid" in the definition of "logon command," as WebEx suggests, because the context in which the term appears in each of the asserted claims
(continued...)

## C.   "Associates the Valid Logon Command with the Remote Computer Unit"

The term "associates the valid logon command with the remote computer unit" appears in claims 3, 4, and 5 of the '945 patent.[128] ABC contends that the term means "to connect or bring into relation a valid logon command with one or more computers that are to be remotely controlled from a remote location using a local computer/interface unit."[129]  WebEx asserts that the term means "uses the valid logon command to connect to the remote computer unit that is associated with the valid logon command."[130]

The context within which the disputed phrase appears makes clear,[131] and the parties agree, that the website performs the

---

[127](...continued)
makes clear that only a valid logon command will enable operation of the associated remote computer unit.  In fact, in all but one of the asserted claims, the term "logon command" is immediately preceded by the word "valid."

[128]The term "associates the valid logon command with the remote computer unit" literally appears only in claim 1 of the originally issued version of the '945 patent.  Claims 3, 4, and 5, however, are written in dependent form, and all depend on claim 1.  As explained above, ABC canceled claim 1 during reexamination, but claims 3, 4, and 5 survived reexamination without amendment.  Therefore, the text of claim 1, including the term "associates the valid logon command with the remote computer unit," remains part of the '945 patent because it is incorporated by dependent claims 3, 4, and 5.

[129]ABC's Brief, Docket Entry No. 154, at 15.

[130]WebEx's Brief, Docket Entry No. 156, at 27.

[131]Claims 3, 4, and 5 of the '945 patent are method claims. The first four steps are common to all three asserted claims:
(continued...)

function of associating the valid logon command with the remote computer unit. The parties disagree, however, as to what is communicated by the term "associates." In other words, they do not agree as to precisely what the website actually does when it "associates" the valid logon command with the remote computer unit. The parties also disagree as to whether the phrase "remote computer unit" requires further explanation or definition, and if so, whether "remote computer unit" refers to only a single remote computer unit, or whether it can be interpreted to refer to one <u>or more</u> remote computer units.

1.  "<u>Associates</u>"

ABC contends that "associates" should be given its ordinary and customary meaning, which -- because "associates" is not a technical term -- can be ascertained from general purpose

---

[131](...continued)
[1] operating a website capable of allowing and facilitating communication between a remote computer unit and an interface unit via an internet;

[2] receiving, by a website, a valid logon command from the interface unit whereby the website <u>associates the valid logon command with the remote computer unit</u>;

[3] receiving, by the website, data signal instructions from the interface unit; and

[4] sending the data signal instructions from the website to the remote computer unit whereby the data signal instructions act to remotely operate the remote computer unit . . . .

'945 patent, claims 3, 4, 5 (emphasis added).

dictionaries.[132]   The first dictionary cited by ABC explains that the verb "associate" means "to connect; combine; join" or "to connect in the mind."[133]   The second dictionary cited by ABC similarly defines "associate" as "connect in the mind" or "join or combine."[134]   Accordingly, ABC begins its proposed definition with the phrase "to connect or bring into relation . . . ."

WebEx argues that the verb "associates," in this context, means "uses . . . to connect to."   WebEx asserts that the claim language of the '945 patent supports this definition because the step immediately following the step of receiving and validating the logon command involves the website receiving data signal instructions from the interface unit (the local element) and sending the data signal instructions on to the remote computer unit.[135]   WebEx also points to the specification of the '945 patent, which states that the computer service control unit "connects the [customer interface unit] to the [multiple computer system] . . . <u>when an encrypted valid PIN is received</u>."[136]

―――――――――――

[132]ABC's Brief, Docket Entry No. 154, at 16; ABC's Response, Docket Entry No. 165, at 10.

[133]<u>Webster's New World Dictionary of the American Language</u> 37 (1984) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 18).

[134]<u>DK Illustrated Oxford Dictionary</u> 56 (1998) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 19).

[135]<u>See</u> '945 patent, claims 3, 4, 5.

[136]'945 patent, col.4 ll.46-48 (emphasis added).

The court notes that the word "connect" is included in both parties' proposed definitions, but appears to carry a slightly different connotation in each.   In WebEx's definition the term "connect" apparently refers to establishing a link or means of communication between two physical objects:  the remote computer unit and, presumably, the website itself.  In ABC's definition the term "connect" conveys the more abstract concept of identifying a relationship or correspondence between two things:  the logon command and a particular remote computer unit.

The court is persuaded that this aspect of ABC's proposed definition is preferable for several reasons.   It is more consistent with the ordinary and customary meaning of "associates." Moreover, the cited excerpts from the claim language and specification do not necessarily suggest that the website "uses" the logon command to connect -- i.e., establish a link for communication -- to the remote computer unit.  Nor are the cited claim and specification excerpts inconsistent with ABC's proposed definition.   In other words, neither the claim language nor the specification indicates that the website cannot or does not, in the abstract, "connect or bring into relation" the logon command with a particular, corresponding remote computer unit.  Accordingly, the court concludes that the term "associates" means "to connect or bring into relation."

2.   "Remote Computer Unit"

ABC's proposed definition describes the remote computer unit as "one or more computers that are to be remotely controlled from

a remote location using a local computer/interface unit." WebEx does not seek to further define this phrase, but objects to this aspect of ABC's definition because it suggests that a remote computer unit can consist of more than one computer.

As explained above in the discussion of the term "logon command," the asserted claims unanimously and unambiguously speak in terms of a single remote computer unit and, therefore, cannot be interpreted to ambiguously refer to one <u>or more</u> computer units as ABC suggests. Also, ABC has not presented any evidence to show that the "remote computer unit" is necessarily equivalent to a "computer." Similarly, ABC has not shown that the "interface unit" disclosed in the '945 patent claims is necessarily equivalent to a "local computer." The court agrees, however, with ABC's descrip-tion of the remote computer unit as a computer unit "that [is] to be remotely controlled from a remote location using a[n] . . . interface unit." This description is consistent with the claim language and specification of the '945 patent, and WebEx does not contend or present evidence to the contrary.

3.  <u>Conclusion</u>

For the reasons explained above, the court concludes that the term "associates the valid logon command with the remote computer unit" means "to connect or bring into relation a valid logon command with a particular computer unit that is to be remotely controlled from a remote location using an interface unit."

**D.    "Billing for Access to the Service"/"Generating a Bill for the Service"**

The term "billing for access to the service" appears in claims 3 and 4 of the '945 patent.  The term "generating a bill for the service" appears in claims 1 and 2 of the '943 patent.  The parties agree that "billing for access to the service," as used in the '945 patent, and "generating a bill for the service," as used in the '943 patent, have the same meaning, but they are unable to agree as to what that single, common meaning is.

ABC asserts that the terms should be defined as "indicating an amount due for access to the service."[137]  WebEx asserts that the terms mean "automatically creating an invoice based on past access to a remote computer unit of a split personal computer system."[138]

**1.    <u>"Billing"/"Generating a Bill"</u>**

The parties' proposed definitions differ in the way that they describe the act of billing or generating a bill.  ABC broadly and simply characterizes billing as "indicating an amount due . . . ."  WebEx defines billing much more specifically and narrowly.  Under WebEx's proposed definition, billing must (1) be conducted automatically, (2) involve an invoice, and (3) be based only on <u>past</u> access to or utilization of the service.

ABC correctly points out that the claim language itself does not require that billing be conducted by any particular entity or

---

[137]ABC's Brief, Docket Entry No. 154, at 17.

[138]WebEx's Brief, Docket Entry No. 156, at 29.

person, at any particular time, or with any particular frequency. ABC further argues that the specifications of the '945 and '943 patents give various examples of billing that support ABC's broad definition.  The specification of the '943 patent provides a few examples of billing:

> The remote system controller can be provided with a billing program which counts the number of minutes that respective local portions . . . are operating at least one of the networked computers of the remote portion . . . .  By employing the remote system controller and the billing program, individuals can 'rent' computer time from the remote portion . . . .[139]

> The remote system controller can also include a billing program which counts the time period in which an individual utilizes at least one of the remote computer units so that either session billings (in the case of hotel rooms billings, for example) or monthly billings could be made.  The time period can be measured in seconds, minutes, or any other suitable unit of time.[140]

Similarly, the specification of the '945 patent contemplates a number of ways that billing could be implemented:

> In the system described, a service provider such as AOL, could charge $20.00 a month  . . . for PC service . . . .[141]

> Public CIU 10 terminals in airports, malls, and hotels will be as common as public phone booths are today, and at about the same cost . . . .[142]

> The time of connection is noted by a multi shared computer connection unit . . . .[143]

---

[139]'943 patent, col.3 ll.34-42.

[140]Id. col.5 ll.22-28.

[141]'945 patent, col.2 ll.33-35.

[142]Id. col.5 ll.20-22.

[143]Id. col.6 ll.58-59.

ABC also cites definitions from two general purpose dictionaries for the non-technical term "bill." The first dictionary defines the noun "bill" as "a statement of charges for goods or services," and the verb "bill" as "to present a statement of charges to."[144] The other dictionary similarly defines the noun "bill" as "a statement of charges for goods supplied or services rendered" or "the amount owed."[145] The second dictionary defines the verb "bill" as "send a note of charges to."[146]

WebEx, in support of its position, cites many of the same excerpts from the specifications of the '943 and '945 patents.[147] It argues that all of these examples involve automation and charging users for past service rendered. WebEx therefore argues that billing must be defined as an automated process only based only on service rendered in the past. WebEx also asserts that prior art involved charging users before they used the service.[148] Further, WebEx argues that the USPTO Examiner who conducted the reexamination of the '945 patent manifested his understanding that

---

[144]Webster's New World Dictionary of the American Language 62 (1984) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 18).

[145]DK Illustrated Oxford Dictionary 85 (1998) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 19).

[146]Id.

[147]See WebEx's Brief, Docket Entry No. 156, at 29-31.

[148]Id. at 30 (citing '943 patent, col.1 ll.33-37; '945 patent, col.1 ll.18-26).

billing under that patent involved charging only for past services
when he stated:

> Billing is disclosed in claims 3 and 4 specifically to
> 'maintain the customer's access to the services' . . . .
> Thus the instant invention clearly establishes that
> payments are for continuing existing services allowing
> the user access to the remote computer.[149]

Based on the evidence in the record, the court is persuaded
that ABC's broader definition of billing is correct.   WebEx
contends that the court should limit the concept of billing to the
examples described in the patent specification that involve
automation and charging for past service, but it is a cardinal rule
of claim construction that the "claims of a patent are not
[generally] limited to the preferred embodiment, or to the examples
listed within the patent specification." Dow Chem. Co., 226 F.3d
at 1341-42.   Although billing may be automated and may only involve
charging for service rendered in the past in some embodiments of
the invention, the patentee did not indicate that automation of
billing or billing only for past service was "important to the
invention." Toro Co., 199 F.3d at 1301.   Therefore, the claim
should not be construed to include those limitations.   Moreover,
the court does not agree that the examples described in the
specification are specifically limited to billing for past service.

---

[149]Notice of Intent to Issue Ex Parte Reexamination
Certificate, at 5, Ex Parte Reexamination of U.S. Patent
No. 6,999,945, Control No. 90/008,122 (March 30, 2009) (included
in WebEx's Brief, Docket Entry No. 156, at Exhibit 6J).

For example, the '945 patent describes a service provider charging a flat monthly rate for the service.[150]  Such a monthly charge could be for future service, i.e., the user could pay for the service in advance.

WebEx's argument that the prior art involved up-front payment is inapt.  There is no rule of patent law that every element or limitation of a claimed invention must exclude or be different than the prior art.  Simply because the claimed invention may encompass one aspect of the prior art does not mean that it is not patentable based on other distinctions.  The method of billing employed by the prior art would only be relevant if WebEx could show that ABC clearly and unmistakably disclaimed that type of billing as a way to distinguish the claimed invention from the prior art for patentability purposes.  See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (explaining that a claim term may be interpreted more narrowly than it otherwise would if the patentee "clear[ly] and unmistakabl[y]" disavowed a particular meaning during prosecution in order to obtain his patent).  WebEx, however, has presented no such evidence.

Nor is the court persuaded by WebEx's argument that the Examiner understood billing to involve charging only for service rendered in the past.  Just because "payments are for continuing an

---

[150]See '945 patent, col.2 ll.33-35 ("[A] service provider such as AOL, could charge $20.00 a month  . . . for PC service . . . .").

-64-

already existing service"[151] does not mean that payments are necessarily for service rendered or received in the past. For example, in the flat monthly rate scenario described above, a user would receive a monthly bill. The amount charged could be for future service. If the user did not pay the bill, the service provider would cease providing the remote control service that the user had, up until that time, received. If the user paid his bill, however, his payment would be "for continuing an already existing service."[152]

Finally, WebEx presents no evidence and makes no argument in support of its position that billing must involve an invoice. Accordingly, consistent with the intrinsic and extrinsic evidence, the court concludes that "billing" or "generating a bill" means "indicating an amount due . . . ."

2.  <u>"Access to the Service"/"The Service"</u>

The parties' proposed definitions also differ in that ABC's definition does not attempt to describe the service for which a bill is generated while WebEx's definition identifies the billed-for service as "access to a remote computer unit of a split

_____

[151]Notice of Intent to Issue <u>Ex Parte</u> Reexamination Certificate, at 5, <u>Ex Parte</u> Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (March 30, 2009) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6J).

[152]<u>Id.</u>

personal computer system." ABC does not explain why it chose not to define "the service" or "access to the service," nor does it raise any specific objection to this aspect of WebEx's definition. Furthermore, the court agrees with WebEx that a definition explaining what "the service" is will be helpful. The court is therefore inclined to adopt this aspect of WebEx's proposed definition, with one modification.

WebEx has described the service as "<u>access</u> to a remote computer." The asserted claims themselves, however, describe the service provided as "<u>controlling</u> a remote computer"[153] and "connecting a local computer unit to a remote computer unit to permit the local computer unit to <u>operate</u> the remote computer unit."[154] The words "controlling" and "operate" carry a significantly different connotation than the word "access."

Moreover, WebEx criticized ABC for suggesting that the term "logon command" enabled "access to" a remote computer unit, and argued that the claim language made clear that the logon command actually enabled "operation of" a remote computer unit.[155] The court was persuaded by WebEx's argument and adopted a definition for "logon command" including the term "operation." Therefore, consistent with the claim language and the court's definition of

---

[153]'945 patent, claims 3, 4, and 5 (emphasis added).

[154]'943 patent, claims 1 and 2 (as amended) (emphasis added).

[155]<u>See</u> WebEx's Response, Docket Entry No. 166, at 16-18.

"logon command," the court concludes that the service provided by the invention and for which a bill is generated is "<u>operation of</u> a remote computer unit of a split personal computer system."

### 3.   Conclusion

The terms "billing for access to the service" and "generating a bill for the service" mean "indicating an amount due for operation of a remote computer unit of a split personal computer system."

## E.   "Monitoring Payments"/"Monitoring Payments Made by the Customer to Maintain the Customer's Access to the Service"

The phrase "monitoring payments made by the customer to maintain the customer's access to the service" appears in claims 3 and 4 of the '945 patent.   WebEx contends that the court should define the phrase as "automatically determining whether a payment has been received for services used, and automatically terminating access if the payment has not been received."[156]   ABC asserts that only the term "monitoring payments" needs to be defined and proposes the following definition:  "any process of various persons or devices for checking on whether payment has been made."[157]   The court will first define "monitoring payments."

### 1.   "<u>Monitoring Payments</u>"

The parties essentially agree that monitoring payments involves "checking on whether payment has been made."   Although

---

[156]WebEx's Brief, Docket Entry No. 156, at 32.

[157]ABC's Brief, Docket Entry No. 154, at 18.

WebEx uses slightly different terminology -- "determining whether payment has been received" -- the court perceives no real difference in this aspect of the parties' proposed definitions. The parties, however, disagree as to whether the step of monitoring payments must be automated and performed by a machine or apparatus, as opposed to a human, and as to whether the payments monitored are only for "services used," i.e., services rendered and received in the past.

> a.  Automation

The court rejects WebEx's contention that monitoring payments must be automated.  WebEx points out that the preferred embodiment of the invention described in the patent specification is capable of automatically monitoring payments.[158]  But, as explained above in the court's discussion of the terms "billing for access to the service" and "generating a bill for the service," the claimed invention should not be limited to the preferred embodiment.  See Dow Chem. Co., 226 F.3d at 1341-42.  Nothing in the claim language, specification, or prosecution history of the '945 patent indicates that the step of monitoring payments must be performed automatically.

---

[158]See '945 patent, col.6 ll.36-41 (describing the "service center control unit," an element within the preferred embodiment of the invention that "has all of the controls and software required to maintain the customer data base with PIN numbers and is responsible for monitoring the payments of each customer").

b.    Various Persons or Devices

ABC asserts that the relevant claim language is broad and open-ended, and does not limit who or what must monitor payments. Indeed, the patented methods of claims 3 and 4 include the same final step, which simply recites "monitoring payments made by the customer to maintain the customer's access to the service."[159]  No other intrinsic evidence limits who or what must perform this step. Therefore, as ABC's definition correctly explains, this step in the patented processes could be performed by "various persons or devices."

WebEx argues that construing the disputed term this broadly, particularly by allowing for the step of monitoring payments to be conducted by a person, renders the claims unpatentable because "systems that depend for their operation on human intelligence alone" are not patentable subject matter under 35 U.S.C. § 101.[160] In re Comiskey, 554 F.3d 967, 980 (Fed. Cir. 2009).  The court is not persuaded by WebEx's argument.   Although it is true that "mental processes -- or processes of human thinking -- standing alone are not patentable," Comiskey, 554 F.3d at 979, "it is inappropriate to determine the patent-eligibility of a claim as a whole based on whether selected limitations constitute patent-eligible subject matter."  In re Bilski, 554 F.3d 943, 958 (Fed. Cir. 2008).    Process claims such as claims 3 and 4 must be

---

[159]'945 patent, claims 3, 4.

[160]See WebEx's Response, Docket Entry No. 166, at 22-23.

-69-

evaluated <u>as a whole</u>, and "it is irrelevant that any individual step or limitation of such process by itself would be unpatentable under § 101." <u>Id.</u>

There is no question that claims 3 and 4, viewed as a whole, constitute patentable subject matter under § 101.  "A claimed process is surely patent-eligible under § 101 if:  (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." <u>Bilski</u>, 554 F.3d at 954.  Claims 3 and 4 are tied to at least three machines or apparatuses:  an interface unit, a website, and a remote computer unit.[161]   Therefore, these claims are not rendered unpatentable merely because the final step in each does not necessarily utilize any of these three devices.

c.   Past Services

WebEx again asserts, as it did with regard to the definition of "billing for access to the service" and "generating a bill for the service," that the bills generated and, therefore, the payments received and monitored, are only for "services used" or received in the past.  WebEx contends that because payments are monitored to "maintain the customer's access to the service,"[162] the payments

_____

[161]<u>See</u> '945 patent, claims 3, 4 (claiming a method "for remotely controlling a <u>remote computer unit</u> using an <u>interface unit</u>, the remote computer unit comprising a personal computer," the first step of which is "operating a <u>website</u> . . ." (emphasis added)).

[162]'945 patent, claims 3, 4.

must be for services rendered in the past.  As explained above in the court's discussion of the billing terms, merely because a payment is made to "maintain" a service does not necessarily mean it is for services rendered in the past.  The payment could just as easily be an up-front payment made so that the user may, in the future, continue to receive a service he has, up until that time, received.  Accordingly, the court is not persuaded that the payments monitored are necessarily associated with past services. The court concludes that "monitoring payments" means "any process of various persons or devices for checking on whether payment has been made."

    2.   "<u>Monitoring Payments Made by the Customer to Maintain the Customer's Access to the Service</u>"

WebEx contends that the clear implication of the phrase "to maintain the customer's access to the service" is that service is automatically terminated if payment is not received.  In response, ABC does not contest WebEx's assertion that service is terminated if payment is not received.[163]  ABC argues only that the process of terminating service need not be automated.[164]

    The court agrees that the word "maintain" clearly suggests that the service will terminate unless payment is received.  The court, however, does not agree with WebEx that termination must be

---

[163]<u>See</u> ABC's Response, Docket Entry No. 165, at 13-14.

[164]<u>See</u> <u>id.</u> ("While monitoring <u>and termination</u> of access could occur automatically, the claim does not require it." (emphasis added)).

automated.   Again, WebEx improperly relies only on the description
of the preferred embodiment for its position that the termination
step must be carried out automatically.[165]   See Dow Chem. Co., 226
F.3d at 1341-42.   The court will not so limit the invention.   The
court concludes that "monitoring payments made by the customer to
maintain the customer's access to the service" means "any process
of various persons or devices for checking on whether payment has
been made, and terminating access to the service if payment has not
been received."

**F.    "Remote System Controller"**

The term "remote system controller" appears in claim 16 of the
'253 patent and claim 1 of the '943 patent.   ABC asserts that a
"remote system controller" is "one or more computer elements
separate from, and facilitating communication between a local and
a remote computer, and validating logon commands to control access
between a plurality of local and remote computers."[166]   WebEx
contends that the term "remote system controller" should be defined
as "a computer or controller that checks validity of logon commands
and interfaces signals between the local portion/computer unit and
the remote computer unit to operate the remote computer unit, but

---

[165]See '945 patent, col.6 ll.36-41 (describing the "service
center control unit," an element within the preferred embodiment
of the invention that "has all of the controls and software
required to maintain the customer data base with PIN numbers and
is responsible for monitoring the payments of each customer to
keep their PIN valid or make invalid if payments are not
received").

[166]ABC's Brief, Docket Entry No. 154, at 19.

excluding devices that forward packets without regard for content and websites."[167]

1.  "Computer Elements" or "Computer or Controller"

ABC contends that a remote system controller is made up of "one or more computer elements."  ABC, however, does not cite any evidence that clearly supports this description.  Instead, the evidence cited by both of the parties supports WebEx's position that a remote system controller consists of "a computer or controller."

The common specification of the '943 patent and the '253 patent explicitly states that "[t]he remote system controller can be any type of computer or controller which is capable of receiving signals transmitted from at least one local portion . . . and supplying such signals to at least one of the remote computer units to permit bi-directional communication therebetween."[168]  The specification also gives a more specific example of a remote system controller, explaining that "the remote system controller can be a network control computer which stores a list of access codes for individuals authorized to use the remote computer units."[169]  In light of this intrinsic evidence, the court concludes that a remote system controller consists of "a computer or a controller."

_____

[167]WebEx's Brief, Docket Entry No. 156, at 8.

[168]'253 patent, col.5 ll.9-14; '943 patent, col.5 ll.13-18 (emphasis added).

[169]'254 patent, col.5 ll.15-17; '943 patent, col.5 ll.19-21 (emphasis added).

2.   <u>Functions of a Remote System Controller</u>

      a.   Validating Logon Commands

The parties agree that the remote system controller checks the validity of logon commands.[170]  This limitation is supported by the language of claim 16 of the '253 patent[171] and claim 1 of the '943 patent.[172]  Accordingly, the court will include this limitation in the definition of remote system controller.

      b.   Interfacing the Local Portion/Computer Unit with the Remote Computer Unit

ABC contends that the remote system controller "facilitat[es] communication between a local and remote computer."[173]  WebEx asserts that the remote system controller "interfaces signals between the local portion/computer unit and the remote computer unit."[174]

Claim 1 of the '943 patent describes the action performed by the remote system controller as "interfacing . . . the local

---

[170]See ABC's Brief, Docket Entry No. 154, at 19 ("validating logon commands . . ."); WebEx's Brief, Docket Entry No. 156, at 8 ("checks validity of logon commands . . .").

[171]See '253 patent, claim 16 (as amended) ("a remote system controller . . . adapted to receive remote logon commands, [and] check the remote logon commands for validity").

[172]See '943 patent, claim 1 (as amended) ("receiving and checking the validity, by the remote system controller, a valid logon command").

[173]ABC's Brief, Docket Entry No. 154, at 19.

[174]WebEx's Brief, Docket Entry No. 156, at 8.

computer unit with the remote computer unit,"[175] and claim 16 of the '253 patent similarly describes the action as "interfac[ing] each individual's local portion with the individual's remote computer unit."[176]  The language used in the claims is slightly different from that proposed by the parties to describe the function performed by the remote system controller.  Although the differences are minor, for consistency's sake, the court will define remote system controller using the same terminology employed in the claim language itself.  Consistent with the claim language, the court's definition will describe the action performed by the remote system controller as "interfacing the local portion/computer unit with the remote computer unit."

            c.    Operating the Remote Computer Unit

WebEx's proposed definition states that the remote system controller validates logon commands and interfaces the local computer unit with the remote computer unit "to operate the remote computer unit."  ABC's proposed definition does not include any such phrase to explain the purpose of validating logon commands and interfacing the local computer unit with the remote computer unit.

Because ABC's definition fails to mention the purpose of logon command validation and interfacing the local computer unit with the remote computer unit, WebEx contends that ABC's definition is

---

[175]'943 patent, claim 1 (as amended).

[176]'253 patent, claim 16 (as amended).

incomplete.[177]   On the other hand, ABC argues that this aspect of WebEx's proposed definition is misleading because it suggests that the remote system controller, and not the local computer unit, operates the remote computer unit.[178]

The court agrees with WebEx that the definition is more accurate, complete, and helpful if it explains why the remote system controller checks the validity of logon commands and interfaces the local computer unit with the remote computer unit. The court also agrees with ABC, however, that WebEx's definition could be understood to suggest that the remote system controller, as opposed to the local computer unit, operates the remote computer unit.   Therefore, to avoid any confusion, the court will adopt language similar to claim 1 of the '943 patent, which explains that the remote system controller validates logon commands and interfaces the local computer unit with the remote computer unit "to permit the local computer unit to operate the remote computer unit . . . ."[179]

3.   Location Limitations

ABC's proposed definition includes the limitation that the remote system controller must be "separate from . . . a local and a remote computer."   WebEx's definition does not include this limitation on the location of the remote system controller.

---

[177]See WebEx's Response, Docket Entry No. 166, at 5.

[178]See ABC's Response, Docket Entry No. 165, at 16.

[179]'943 patent, claim 1 (as amended).

Claim 1 of the '943 patent explicitly provides that the remote system controller must be "remote from the local computer unit and the remote computer unit."[180]  The language of claim 16 of the '253 patent, however, does not include the same explicit limitation. Claim 16 describes the remote system controller as part of the "remote portion" of the split personal computer system.[181]  By use of the term "remote," claim 16 strongly suggests that the remote system controller, a component of the remote portion, must be located separately from the local computer unit.  It does not, however, suggest that the remote system controller must necessarily be located separately from the remote computer unit as required by claim 1 of the '943 patent, and leaves open the possibility that the remote system controller could be co-located with the remote computer unit.

The specification of the '253 patent provides additional guidance.  It explains that the "remote portion 22" -- of which the remote system controller is a part -- is the portion of the split personal computer system that is "disposed remotely with respect to the local portions," and "is provided with a plurality of remote computer units 24."[182]  Furthermore, Figure 1 of the '253 patent depicts the remote portion (22) as consisting of the remote system

_____

[180] '943 patent, claim 1 (as amended).

[181] '253 patent, claim 16 (as amended) ("the remote portion comprising:  a remote system controller . . .").

[182] '253 patent, col.4 ll.47-55.

controller (26), along with multiple remote computer units (24a, 24b).[183]  This strongly indicates that the remote system controller need only be located separately from the local portion(s), but may be co-located with the remote computer unit(s) as part of the "remote portion."

Because the two asserted claims that include the term remote system controller do not both require that the remote system controller be located separately from <u>both</u> the local computer unit and the remote computer unit, the court will not include ABC's proposed "separate from" limitation in its definition.  The language of each claim sufficiently describes the necessary location of the remote system controller.  Therefore, the court need not include any limitation regarding the location of the remote system controller in the definition of the term.

4.  <u>Exclusions</u>

WebEx asserts that ABC disclaimed two categories of devices from the scope of the term remote system controller during the prosecution of the asserted patents, and that these exclusions should be reflected in the court's definition of the term.  Each alleged disclaimer will be addressed.

a.  Switches, Routers, and Other Similar Passive Devices

WebEx first asserts that during the reexamination of the '253 and '943 patents, ABC distinguished the claimed remote system

---

[183]<u>See</u> '253 patent, Figure 1.

controller from switches, routers, and other such passive devices that appeared in a particular prior art reference known as "Crawford," thereby excluding them from the scope of the term remote system controller.[184]  ABC does not deny that it disavowed the passive devices from the scope of the term remote system controller.  Instead, ABC contends that the court need not note the exclusion of passive devices in the definition of remote system controller because a remote system controller, which receives and checks the validity of logon commands, by definition, is not a passive device.[185]

In a Response to Office Action during the reexamination of the '253 patent, ABC stated:

> The only components in Crawford that interfaces the customer computer with the online replica computer are the switches and routers detailed in Figure 4 . . . . Switches and routers, however, are not a 'remote system controller' as recited in claim 16.
>
> As previously discussed, switches and routers are devices that are capable of determining the source and destination of data packets, and forward the data packets accordingly. . . . These routers, switches, and the like are merely passive conduits for data.  They merely forward the data packets without regard for their content.  As such, it is unclear to the Patent Owner how a router or switch could read on a 'remote system controller' as recited in claim 16.[186]

---

[184]WebEx's Brief, Docket Entry No. 156, at 10–11.

[185]ABC's Response, Docket Entry No. 165, at 16–17.

[186]Response to Office Action in Ex Parte Reexamination, at 13, Ex Parte Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (Feb. 19, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 4H).

Similarly, during the reexamination of the '943 patent, ABC stated in a Response to Office Action:

> [T]he only component in Crawford that interfaces the customer computer with the online replica computer are the switches and routers detailed in Figure 4 . . . . But switches and routers are not the same as the 'remote system controller' or 'network control computer' in the Patent Owner's claims.
>
> Generally, these types of switches and routers are devices that are capable of inspecting data packets, determining the source and destination of the data packets, and forwarding the data packets. . . . [S]uch switches, routers, and the like are merely passive conduits for the commands received and transmitted by them.  Specifically, they merely forward data packets without regard to the contents, senders, or recipients of the data packets.  As such, it is unclear to the Patent Owner how a mere switch or router could be considered to 'receive' a valid logon command as recited in independent claims 1 and 2.[187]

The court agrees with WebEx that these statements by ABC constitute "'a clear and unmistakable disavowal of scope during prosecution.'"  Computer Docking Station Corp., 519 F.3d at 1374 (quoting Purdue Pharma L.P., 438 F.3d at 1136).  Accordingly, ABC cannot recapture the disavowed devices to prove infringement.  See id. at 1379 ("[The plaintiff] cannot recapture claim scope disavowed during prosecution to prove infringement.").  To ensure that ABC does not attempt to recapture the disclaimed devices, the court will note the exclusion in its definition of remote system controller.  Even if such devices are already excluded by the

_____

[187]Response to Office Action in Ex Parte Reexamination, at 9, Ex Parte Reexamination of U.S. Patent No. 7,016,943, Control No. 90/008,053 (Feb. 19, 2008) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 5D).

definition as ABC suggests, the court sees no reason not to make the exclusion explicit.

### b.   Websites

WebEx asserts that ABC also disclaimed websites from the scope of the term remote system controller during prosecution.[188]   ABC counters that it did not clearly and unmistakably disavow websites from the scope of the term remote system controller; and therefore, an express exclusion of websites from the definition of remote system controller is unwarranted.[189]

The term "website" does not appear in the common specification of the '253 and '943 patents.[190]   In October of 2004 ABC submitted an amendment to the application for the '943 patent canceling all prior claims and submitting three new claims, numbered 45, 46, and 47, that included the term website either in addition to or in place of the term remote system controller.[191]   Specifically, ABC proposed two method claims -- proposed claims 45 and 46 -- including the step of "establishing a remote system controller as a website on an internet," and another method claim -- proposed claim 47 -- including the step of "operating a website."[192]

---

[188]WebEx's Brief, Docket Entry No. 156, at 11-12.

[189]ABC's Response, Docket Entry No. 165, at 17-18.

[190]See '253 patent; '943 patent.

[191]See Second Preliminary Amendment, at 2-4, Application Serial No. 10/253,332 (Oct. 14, 2004) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 5A).

[192]Id.

The Examiner rejected these new proposed claims because the specification, which does not mention the term "website," failed to adequately describe the claimed invention or enable one skilled in the art to make and/or use it.[193]  See 35 U.S.C. § 112, ¶ 1 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . .").

In response to the Examiner's rejection of the new claim language including the term "website," ABC withdrew its proposed claim 45 and modified claims 46 and 47 to remove the term website.[194]  Proposed claim 46, which became claim 1 of the issued '943 patent, was amended from "establishing a remote system controller as a website on an internet" to simply "establishing a remote system controller."[195]  Proposed claim 47, which became claim 2 of the issued '943 patent, was amended from "operating a website" to "operating a network control computer."[196]  ABC stated that although it disagreed with the Examiner's conclusion that the

---

[193]Office Action, at 2, Application Serial No. 10/253,332 (Dec. 1, 2004) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 5B).

[194]Amendment, at 2-3, Application Serial No. 10/253,332 (Jan. 7, 2005) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 5C).

[195]Id. at 2.

[196]Id. at 3.

specification did not support the claim language including the term "website," ABC agreed to remove the term "in an effort to expedite the allowance of claims 46 and 47 . . . ."[197]

The court concludes that ABC did not make "'a clear and unmistakable disavowal of scope during prosecution'" with regard to websites.  Computer Docking Station Corp., 519 F.3d at 1374 (quoting Purdue Pharma L.P., 438 F.3d at 1136).  To the contrary, ABC maintained at the time it removed the term "website" from the claim language that the concept of a website was adequately disclosed in and enabled by the specification.  ABC's withdrawal of the term "website" from the claim language was "merely a part of the 'ongoing negotiation' process with the PTO, and not an indication that [ABC] intended to disclaim particular subject matter."  Synthes (USA) v. Smith & Nephew, Inc., 547 F. Supp. 2d 436, 445 (E.D. Pa. 2008).  Accordingly, the court will not specifically exclude websites from the definition of remote system controller.

### 5.  Conclusion

The term "remote system controller" means "a computer or controller that checks the validity of logon commands and interfaces the local portion/computer unit with the remote computer unit to permit the local portion/computer unit to operate the

---

[197]Id. at 4-5.

remote computer unit, but excluding passive devices that merely forward data packets without regard for their content."

## G.   "Network Control Computer"

The term "network control computer" appears in claim 2 of the '943 patent.  WebEx contends that "network control computer" should be defined identically to "remote system controller" and, therefore, suggests the following definition:  "a computer or controller that checks validity of logon commands and interfaces signals between the local portion/computer unit and the remote computer unit to operate the remote computer unit, but excluding devices that forward packets without regard for content and websites."[198]  ABC argues that the claim language and specification of the '943 patent make clear that the terms "remote system controller" and "network control computer" are not synonymous, and asserts that the definition of "network control computer" must account for the differences.[199]  ABC contends that the proper definition for "network control computer" is "one or more computational devices that maintain a list of access codes for individuals authorized to use the remote computers and facilitate the connection between the remote and local computers upon receiving a valid logon command."[200]

---

[198]See WebEx's Brief, Docket Entry No. 156, at 8-12; WebEx's Response, Docket Entry No. 166, at 6-8.

[199]See ABC's Brief, Docket Entry No. 154, at 24-25; ABC's Response, Docket Entry No. 165, at 15-16, 25.

[200]Id. at 24.

1.   "Computational Devices" or "Computer or Controller"

ABC contends that a network control computer is composed of "one or more computational devices."  ABC, however, presents no evidence that supports this assertion.  ABC makes the conclusory argument that the claim language and specification support this aspect of its definition, but does not point to any mention of "computational devices."  Nor does ABC explain why the singular form of the word "computer" was employed by the patent drafter if the term was intended to refer to multiple devices.

The extrinsic evidence cited by ABC does not support this aspect of its definition.  Although the word "network" is defined in a technical dictionary cited by ABC as "[a] group of computers and associated devices that are connected by communications facilities,"[201] this does not suggest that a network control computer is made up of multiple computers or devices.  Instead, it more likely suggests that the network control computer is a single computer that controls a "network" of multiple computers.

WebEx asserts that a network control computer is "a computer or controller."  But this aspect of WebEx's proposed definition is not consistent with the specification of the patent, which cites a network control computer as a possible embodiment of a remote

---

[201]Microsoft Press Computer Dictionary 297 (1991) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 17).  See also 21st Century Dictionary of Computer Terms 241 (1994) (defining "network" as "[a]n information system based on two or more computers connected through telecommunications hardware and software") (included in ABC's Brief, Docket Entry No. 154, at Exhibit 20).

system controller.[202]   The court has defined, consistent with the specification,[203] a remote system controller as "a computer or controller."  Because the term "network control computer" includes the specific word "computer," the network control computer most logically falls into the first potential category of remote system controller -- computer -- rather than the later category -- controller.   Accordingly, the court concludes that a network control computer is a single computer.

2.   <u>Functions of a Network Control Computer</u>

ABC asserts that the network control computer "maintain[s] a list of access codes for individuals authorized to use the remote computers" and "facilitate[s] the connection between the remote and local computers upon receiving a valid logon command."   WebEx asserts that the network control computer "checks the validity of logon commands" and "interfaces signals between the local portion/computer unit and the remote computer unit to operate the remote computer unit."

a.   Maintaining a List of Access Codes

ABC asserts that the network control computer "maintain[s] a list of access codes for individuals authorized to use the remote

_____

[202]'943 patent, col.5 ll.19-20 ("For example, the remote system controller can be a network control computer . . . .").

[203]<u>See</u> <u>id.</u> col.5 ll.13-14 ("The remote system controller can be any type of computer or controller . . . .").

-86-

computers." ABC bases this assertion on the only sentence in the specification of the '943 patent that mentions a network control computer: "For example, the remote system controller can be a network control computer which stores a list of access codes for individuals authorized to use the remote computer units."[204]

The cited sentence appears within a two-paragraph description of the function and possible embodiments of a remote system controller:

> The remote system controller 26 communicates with the telephone network controller 14 and the television network controller 18 via respective communication links 27a and 27b and also communicates with the remote computer units 24a and 24b via respective communication links 28a and 28b. The remote system controller 26 can be any type of computer or controller which is capable of receiving signals transmitted from at least one local portion 12 of the split personal computer system 10 and supplying such signals to at least one of the remote computer units 24 to permit bidirectional communication therebetween.

> For example, the remote system controller 26 can be a network control computer which stores a list of access codes for individuals authorized to use the remote computer units 24. The remote system controller can also include a billing program which counts the time periods in which an individual utilizes at least one of the remote computer units . . . .[205]

Viewed in context, the underlined sentence suggests that a network control computer may fall within the definition of and is one possible embodiment of a remote system controller.[206] But the

---

[204] '943 patent, col.5 ll.19-21.

[205] '943 patent, col.5 ll.8-28 (emphasis added).

[206] WebEx agrees, based on this sentence, that a network control computer "is a type of remote system controller."

(continued...)

sentence, standing alone, does not clearly convey whether (1) all network control computers qualify as remote system controllers and store a list of access codes, or (2) only certain network control computers store a list of access codes, and thereby qualify as remote system controllers.

Although both interpretations are plausible, the court concludes that the first interpretation of the sentence -- i.e., that all network control computers store a list of access codes and are remote system controllers -- is correct.  Under this interpretation the difference in scope between claim 1 and claim 2 is much more clearly defined.[207]  See Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000) ("Under the doctrine of claim differentiation, two claims of a patent are presumptively of

_____

[206](...continued)
WebEx's Brief, Docket Entry No. 156, at 9.  ABC's expert witness also asserts, citing this sentence, that "a Network Control Computer is a subset of a Remote System Controller."  Affidavit of Ivan Zatkovich, ¶ 28 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).  ABC, however, attempts to argue the converse in its response brief, suggesting that a remote system controller that stores a list of access codes is a subcategory or type of network control computer.  See ABC's Response, Docket Entry No. 166, at 25 ("[A] network control computer is not necessarily a remote system controller, although one device can perform functions of both elements.  A network control computer 'stores a list of access codes for individuals authorized to use the remote computer units.'  A remote system controller is a network control computer if it performs this function." (citations omitted)).  This argument, besides being inconsistent with ABC's own expert witness testimony, is not supported by the particular sentence from the specification relied upon by ABC, when viewed in context.

[207]The primary difference between claims 1 and 2 of the '943 patent is that claim 1 requires a remote system controller while claim 2 requires a network control computer.

-88-

different scope."). Under the first interpretation, claim 2 of the '943 patent is narrower than claim 1 because claim 2 is limited to operating a particular embodiment -- i.e., a network control computer -- of the broader category of devices allowed by claim 1 -- i.e., remote system controllers.  This would not be the case under the second interpretation because under that interpretation some network control computers might not qualify as remote system controllers.

Additionally, if the court were to adopt the second interpretation, the court would need to include the limitation regarding storing a list of access codes in the definition of remote system controller -- something neither party has advocated -- because the presence of that limitation would be a characteristic necessary to qualify as a remote system controller, not as a network control computer.  Under the first interpretation, however, storing a list of access codes is a unique feature that network control computers must have and, therefore, belongs in the definition of that term.

The court also notes that although WebEx's proposed definition does not include this limitation, WebEx offers no evidence or argument to counter ABC's argument that network control computers necessarily store a list of access codes.[208]  Accordingly, the court

---

[208]See WebEx's Response, Docket Entry No. 166, at 6-8 (failing to address ABC's contention that the network control computer maintains a list of access codes).

concludes that a network control computer stores a list of access codes for individuals authorized to use the remote computer units.[209]

b.   Checking the Validity of Logon Commands

WebEx contends that the network control computer checks the validity of logon commands and faults ABC's proposed definition for omitting this function.   ABC contends that the network control computer need not necessarily be able to check the validity of logon commands.   In support of its position, ABC offers the affidavit of a purported expert witness who attempts to differentiate the functions performed by the remote system controller and the network control computer.   He asserts that

> [t]he primary difference between these two structures is that a remote system controller validates logon commands and a network control computer maintains a list of access codes or login IDs for individuals authorized to use the remote computers.   This means the Network Control Computer does not necessarily validate a login command but can identify the authorized users.   Whereas, the Remote System Controller does in fact perform validation of the login command.[210]

The court finds ABC's argument illogical and unpersuasive. Claim 2 of the '943 patent explicitly states that the network control computer "check[s] the validity of a valid logon

_____

[209]The court uses the term "stores" instead of "maintains" and the term "remote computer units" instead of "remote computers" because these are the terms used in the specification.

[210]Affidavit of Ivan Zatkovich, ¶ 30 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

command."[211]  In fact, during the reexamination of the '943 patent, ABC specifically added the phrase "and checking the validity" to claim 2 to make explicit that the network control computer was capable of that function.[212]

Moreover, ABC's expert witness admits that "a Network Control Computer is a subset of a Remote System Controller."[213]  ABC and its expert also admit that a remote system controller, by definition, checks the validity of logon commands.[214]  If a network control computer is indeed a "subset" of the broader category of remote system controllers -- which, by definition, must be capable of checking the validity of logon commands -- then a network control computer must necessarily be able to check the validity of logon commands.  Otherwise, it would not fit within the definition of a remote system controller.

---

[211]'943 patent, claim 2 (as amended by Supplemental Amendment).

[212]See Supplemental Amendment and Response to Notice of Defective Paper in Ex Parte Reexamination, at 3, Ex Parte Reexamination of U.S. Patent No. 7,016,943, Control No. 90/008,053 (Oct. 23, 2008) (adding phrase "and checking the validity" to claim 2) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 11, and in WebEx's Brief, Docket Entry No. 156, at Exhibit 5E).

[213]Affidavit of Ivan Zatkovich, ¶ 28 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

[214]See ABC's Brief, Docket Entry No. 154, at 19 (proposing a definition for "remote system controller" that includes the phrase "validating logon commands"); Affidavit of Ivan Zatkovich, ¶ 30 (May 28, 2009) ("[A] remote system controller validates logon commands . . . .") (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

The function of storing a list of access codes and checking the validity of logon commands are not mutually exclusive.  Indeed, storing a list of access codes may be the feature of a network control computer that enables it to validate logon commands.  Accordingly, the court concludes that a network control computer checks the validity of logon commands and will include this function in the definition.

        c.    Interfacing the Local Computer Unit with the Remote Computer Unit

ABC asserts that a network control computer "facilitate[s] the connection between the remote and local computers . . . ."  ABC's proposed definition for the term remote system controller is remarkably similar in this regard, stating that the remote system controller "facilitat[es] communication between a local and remote computer . . . ."  WebEx asserts that both a network control computer and a remote system controller "interface[] signals between the local portion/computer unit and the remote computer unit . . . ."  In light of these proposed definitions, the parties apparently agree that a network control computer and a remote system controller perform the same function with respect to the local and remote computer units.

Claim 2 of the '943 patent states that the network control computer "connect[s] the remote computer unit to the local computer unit . . . ."[215]  Claim 1 of the same patent describes the

_____

[215]'943 patent, claim 2 (as amended) (emphasis added).

corresponding function of the remote system controller as "interfacing . . . the local computer unit with the remote computer unit . . . ."[216]

Although claim 2 describes the network control computer as "connect[ing] . . . to" and claim 1 describes the remote system controller as "interfacing . . . with," the court concludes, as the parties do, that the functions are no different. Several dictionaries define the verb "interface" using the term "connect."[217] Moreover, the court has already concluded that a network control computer is a subset or type of remote system controller. Therefore, a network control computer must be able to perform the same functions as a remote system controller. Accordingly, the court will use the same language to describe this common functionality of the network control computer and the remote system controller. The network control computer interfaces the local computer unit with the remote computer unit.

### d.   Operating the Remote Computer Unit

WebEx's proposed definition states that the remote system controller validates logon commands and interfaces the local computer unit with the remote computer unit "to operate the remote

---

[216]'943 patent, claim 1 (as amended) (emphasis added).

[217]See, e.g., Random House Webster's College Dictionary (1999) (defining "interface" as "to bring together; connect or mesh" (emphasis added)); Merriam Webster's Collegiate Dictionary (10th ed. 1996) (defining "interface" as "to connect by means of an interface").

computer unit."  ABC's proposed definition does not include any such phrase to explain the purpose of validating logon commands and interfacing the local computer unit with the remote computer unit.

Claim 2 explicitly states that the network control computer "connect[s] the remote computer unit to the local computer unit <u>permitting the local computer unit to operate the remote computer unit</u> upon receipt and checking the validity of a valid logon command . . . ."[218]  Moreover, the court's definition of remote system controller -- a category of devices of which network control computers are a subset -- explains that the purpose of validating logon commands and interfacing the local and remote computer units is "to permit the local . . . computer unit to operate the remote computer unit."  Accordingly, the court's definition of network control computer will recognize that a network control computer validates logon commands and interfaces the local and remote computer units to permit the local computer unit to operate the remote computer unit.

### 3.  <u>Exclusions</u>

As it did with regard to the term remote system controller, WebEx asserts that ABC disclaimed two categories of devices from the scope of the term network control computer during the prosecution of the '943 patent and that these exclusions should be reflected in the court's definition of the term.  The underlying

---

[218] '943 patent, claim 2 (as amended) (emphasis added).

facts and arguments are identical.  Accordingly, for all the same reasons stated above in the court's discussion of the term remote system controller, the court concludes that ABC clearly and unmistakably disavowed passive devices that merely forward data packets without regard for their content from the scope of the term network control computer.  ABC, however, did not clearly and unmistakably disavow websites.  The court's definition will so reflect.

### 4.    Conclusion

A "network control computer" is "a computer that stores a list of access codes for individuals authorized to use the remote computer units, checks the validity of logon commands, and interfaces the local computer unit with the local computer unit to permit the local computer unit to operate the remote computer unit, but excluding passive devices that merely forward data packets without regard for their content."

## H.   "Established on the World Wide Web"

The term "established on the World Wide Web" appears in claim 16 of the '253 patent.  The term imposes an additional limitation on the remote system controller required by that claim. In other words, the remote system controller described in claim 16 must be  "established on the World Wide Web."[219]

---

[219] '253 patent, claim 16 (as amended).

ABC asserts that "established on the World Wide Web" means "that is accessible as a service on the Internet and can be located by a URL."[220]   WebEx contends that the term means "able to be communicated with through a browser using HTTP and HTML interpretation."[221]

### 1.   Accessible as a Service

ABC asserts that a device that is "established on the World Wide Web" must be "accessible as a service."  ABC, however, cites no evidence, intrinsic or extrinsic, that supports this aspect of its definition.  None of the cited evidence describes the WWW or devices associated with the WWW as "accessible as a service" or as necessarily providing a service.  Therefore, the court will not include this limitation in its definition of "established on the World Wide Web."

### 2.   Accessible on the Internet and Locatable by a URL

ABC contends that a device that is established on the WWW is accessible on the Internet and can be located by a URL.  WebEx does not deny that devices that are established on the WWW are accessible on the Internet.  In fact, WebEx specifically admits in its response brief that devices established on the WWW are a "subset of devices on the Internet."[222]   Nor does WebEx deny that

---

[220]ABC's Brief, Docket Entry No. 154, at 21.

[221]WebEx's Brief, Docket Entry No. 156, at 12.

[222]WebEx's Response, Docket Entry No. 166, at 14.

-96-

devices that are established on the WWW are locatable by a URL.  To the contrary, WebEx admits that devices on the WWW can be located using URLs.[223]  Furthermore, the available evidence, both intrinsic and extrinsic, supports ABC's position that a device that is established on the WWW is accessible on the Internet and can be located by a URL.[224]

Despite its own admissions and the available evidence, WebEx argues that the definition of the term "established on the World Wide Web" should not mention the characteristics of being accessible on the Internet and locatable by a URL because other devices that are not established on the WWW also have these

_____

[223]See id. at 15 ("[W]hile a URL can be used to locate devices on the World Wide Web, a URL also can be used to locate devices that are not on the World Wide Web. . . . ABC's proposal to define devices established on the World Wide Web as those that can be located with a URL fails to distinguish those devices from others that can be located with a URL but are not established on the World Wide Web.").

[224]See, e.g., United States Patent No. 6,167,441 col.1 ll.20-22 (filed Nov. 21, 1997) (intrinsic evidence) ("The World Wide Web, or simply 'the web,' is the Internet's multimedia information retrieval system.  It is the most commonly used method of transferring data in the Internet environment. . . . The path to a particular Web server is defined by a Uniform Resource Locator (URL).") (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 9).  This patent was cited during the prosecution of the '945 patent in a Notice of References Cited. See Notice of References Cited (May 27, 2003) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6C).  See also, e.g., Microsoft Computer Dictionary 479 (4th ed. 1999) (extrinsic evidence) (defining "Web page" as "[a] document on the World Wide Web . . . in a particular directory on a particular machine (and thus identifiable by a URL)," defining "Web directory" as "a list of Web sites, giving the URL . . . of each," and for the term "Web address," referring readers to the definition of URL, suggesting that the terms are synonymous) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 10).

characteristics.[225]   The court is not persuaded by WebEx's argument.[226]   Even if certain devices that are not established on the WWW are accessible on the Internet and locatable by a URL, that does not mean that these characteristics should be excluded from the definition of "established on the World Wide Web."  The court concludes that a device that is "established on the World Wide Web" is accessible on the Internet and can be located by a URL.  The court will include these characteristics in its definition of "established on the World Wide Web."

3.   Able to be Communicated with through a Browser Using HTTP and HTML Interpretation

WebEx asserts that a device that is established on the WWW may be communicated with through a browser using HTTP and HTML interpretation.  ABC contends that a browser using HTTP and HTML interpretation is not the only means of communication with a device established on the WWW and, therefore, is too narrow a limitation.

a.   Communicated with through a Browser

The evidence provided by the parties suggests that devices established on the WWW may be communicated with through a browser.

_____

[225]To the extent that WebEx argues that the characteristics of being accessible on the Internet and locatable by a URL alone are not sufficient to define being established on the WWW, the court agrees.  As explained below, at least one additional limitation is required.

[226]WebEx made a similar argument with respect to the definition of the term "website," and the court found it equally unpersuasive.

For example, one prior art patent cited during the prosecution of the '945 patent (intrinsic evidence) states that "[t]he WWW is a collection of files written using [HTML] . . . . HTML files may be accessed and displayed using specialized applications known as 'web' browsers . . . ."[227]   Another prior art patent (intrinsic evidence) similarly explains that

> [t]he World Wide Web (WWW) is one of the most popular information services on the Internet.  The WWW uses browser software to decipher hypertext links to other documents or files located on remote computers all of which are connected through remote computers.  Browsers therefore provide a user-friendly graphical interface which allows users to easily navigate or surf from site to site or file to file around the Internet.[228]

The same patent explains that a browser provides a user the ability to both send and receive data to and from servers.[229]

ABC points out in its response brief that the USPTO Examiner, during the reexamination of the '253 patent, described certain devices disclosed in a particular prior art reference -- specifically, routers, switches, and cards -- as established on the

---

[227]United States Patent No. 5,961,586 col.1 ll.15-21 (filed May 14, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 8).  This patent was cited during the prosecution of the '945 patent in a supplemental disclosure.  See Second Supplemental Disclosure (Oct. 23, 2000) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6B).

[228]United States Patent No. 6,138,150 col.1 ll.17-24 (filed Sept. 3, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 14).  This patent was cited during the prosecution of the '945 patent in an Information Disclosure Statement submitted to the Examiner by ABC.  See Information Disclosure Statement by Applicant (April 20, 2005) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6E).

[229]United States Patent No. 6,138,150 col.1 ll.24-34, 53-58 (filed Sept. 3, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 14).

WWW.[230]  ABC then asserts that "[i]t is indisputable that a router, switch, or card is not 'communicated with through a browser using HTTP and HTML interpretation.'"[231]  Although ABC may believe this fact to be "indisputable," it provides no evidentiary support for it.  The affidavit of ABC's expert witness, which ABC cites, does not mention routers, switches, or cards, nor does it identify any other sort of device that is established on the WWW, but which cannot be communicated with through a browser.[232]  Therefore, based on the available evidence, the court concludes that a device that is established on the WWW can be communicated with through a browser.

      b.   HTTP and HTML

WebEx further contends that a browser used to communicate with a device established on the World Wide Web is limited to using HTTP and HTML interpretation.  In support of this contention, WebEx cites two prior art patents.[233]  The first patent ("the '586 patent") states that "[t]he WWW is a collection of files written using [HTML] . . . .  Servers hosting HTML files can communicate

---

[230]See ABC's Response, Docket Entry No. 166, at 21 (citing Office Action in Ex Parte Reexamination, at 9, Ex Parte Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (Dec. 19, 2007) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 4G)).

[231]Id.

[232]See Affidavit of Ivan Zatkovich, ¶¶ 33-38 (May 28, 2009) (included in ABC's Response, Docket Entry No. 165, at Exhibit A).

[233]WebEx's Brief, Docket Entry No. 156, at 14 & nn.11-12.

using [HTTP].  HTTP is an application protocol that provides users access to files . . . using the HTML page description language."[234] The second prior art patent ("the '441 patent") provides that "[i]n the Web environment, clients request Web pages from Web servers using the [HTTP].  HTTP is a protocol that provides users access to files which include text, graphics, images, [and] sound, using a standard page description language known as the [HTML]."[235]

WebEx also cites a number of statements made by the USPTO Examiner during the <u>ex parte</u> reexamination of the '253 patent.[236] These statements clearly indicate that the Examiner believed that any device that communicates utilizing HTTP would read onto the "established on the World Wide Web" limitation of claim 16.[237]

---

[234]United States Patent No. 5,961,586 col.1 ll.15–17, 22–26 (filed May 14, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 8).  This patent was cited during the prosecution of the '945 patent in a supplemental disclosure.  <u>See</u> Second Supplemental Disclosure (Oct. 23, 2000) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6B).

[235]United States Patent No. 6,167,441 col.1 ll.13–18 (filed Nov. 21, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 9).  This patent was cited during the prosecution of the '945 patent in a Notice of References Cited.  <u>See</u> Notice of References Cited (May 27, 2003) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 6C).

[236]WebEx's Brief, Docket Entry No. 156, at 15 & n.13.

[237]<u>See</u> Office Action in Ex Parte Reexamination, at 14–15, <u>Ex Parte</u> Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (Dec. 19, 2007) ("Broadway specifically discloses the benefit of a split personal computer system operating using [HTTP] over the World Wide Web . . . and thus the means for permitting bi-directional communication between the remote and local hosts is 'established on the World Wide Web.'") (included...)
                                                              (continued...)

In response, ABC asserts that although the excerpt from the two prior art patents cited by WebEx might seem to suggest that communication on the WWW is limited to using HTTP and HTML, the same patents elsewhere discusses Web communication using other protocols and other programming languages. The '586 patent explains that a user, through a browser, may specify "a link via a [URL]. Upon such specification, the client makes a TCP/IP request to the server identified in the link and receives a 'Web page' in return."[238]   TCP/IP, or "transmission control protocol/internet protocol,"[239] is a different protocol than HTTP. The '586 patent also discusses the limitations of HTML, noting that it "is a

_____

[237](...continued)
in WebEx's Brief, Docket Entry No. 156, at Exhibit 4G); id. at 15 ("[O]ne of ordinary skill would have been motivated to add HTTP to Crawford . . ., thus creating a system controller 'established on the World Wide Web.'"); id. ("[A]ny host computer 104 or router/switch that runs HTTP for the connected computers would read on [the 'established on the World Wide Web'] limitation."); id. at 18 ("[O]ne of ordinary skill would have been motivated to add HTTP to pcANYWHERE . . . thus creating a system controller 'established on the World Wide Web.'"); id. ("[A]ny modern ISP controller that runs [HTTP] for the members of the subnet would read on the ['established on the World Wide Web'] limitation; for example, if the remote host also had the ability to run Mosaic or another browser popular at the time and the ISP interfaced web data for the remote host via HTTP, it would read on the claim even despite the fact that the pcANYWHERE software itself is not taught as being web-based.").

[238]United States Patent No. 5,961,586 col.1 ll.29-33 (filed May 14, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 8).

[239]David W. Brooks, Web-Teaching: A Guide to Designing Interactive Teaching for the World Wide Web 190 (1997) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 15).

'display only' language."[240]   The patent then explains that the limitations of HTML may be overcome by embedding within HTML files "applications" written in other programming languages.[241]   As an example, the patent cites the JAVA programming language.[242]

The '441 patent also describes that use of other programming languages to communicate on the WWW.  It explains that web browsers may support not only HTML, but also "dynamic HTML, XML, Java, [and] JavaScript."[243]

Furthermore, the '253 patent itself mentions the use of the JAVA programming language.  The specification explains that "[t]he system of the present invention can be implemented by utilizing a programming language called JAVA . . . .   The JAVA language is ideally suited to allow communication between the Graphical User Interface (GUI) requirements of a local portion . . . and the remote portion of the split personal computer system."[244]

ABC also points out that although the Examiner believed that any device that communicates utilizing HTTP would read onto the "established on the World Wide Web" limitation of claim 16, none of

---

[240]United States Patent No. 5,961,586 col.1 ll.47-50 (filed May 14, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 8).

[241]Id. col.1 ll.50-59.

[242]Id.

[243]United States Patent No. 6,167,441 col.1 ll.60-66 (filed Nov. 21, 1997) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 9).

[244]'253 patent, col.2 ll.3-10.

the Examiner's statements indicated that communication on the WWW is limited only to HTTP.   More importantly, ABC made no representations limiting the invention to utilizing only HTTP.

Considering all the available evidence the court is persuaded that a browser communicating with a device that is established on the WWW is not limited to using HTTP and HTML interpretation.  The evidence indicates that browsers communicating with devices established on the WWW may utilize other protocols and programming languages.

4.  <u>Conclusion</u>

The term "established on the World Wide Web" means "(1) accessible on the Internet, (2) can be located by a Uniform Resource Locator (URL), and (3) can be communicated with through a browser."

**I.  "Video Signals"**

The term "video signals" appears in claim 16 of the '253 patent.  ABC contends that "video signals" are "a type of data signal[s] sent from the remote computer to the local computer/interface unit for the production of images on the video display."[245]   WebEx asserts that "video signals" are "signals specifically designated for carrying video information as opposed to general data."[246]

_____

[245]ABC's Brief, Docket Entry No. 154, at 22.

[246]WebEx's Brief, Docket Entry No. 156, at 28.

1.   Meaning of "Video"

The parties' proposed definitions differ in the way they describe how the word "video" describes or limits the word "signals."   ABC's definition provides that video signals are signals "for the production of images on the video display." Therefore, ABC's definition explains that the adjective "video" connotes an association with the production of images.   WebEx's definition, on the other hand, is apparently intended solely to differentiate video signals from data signals, and does not elaborate on the meaning of "video."   WebEx's definition circularly provides that video signals are "for carrying video information . . . ."

The court concludes that ABC's proposed definition is more helpful in this regard, and is consistent with the intrinsic and extrinsic evidence.  The specification of the '253 patent describes one embodiment of the invention in which video signals and data signals received by the local portion from the remote computer unit are formatted into "audio television signals, video television signals, or audio and video television signals."[247]   These television signals are then "transmitted to the television display unit so that the television signals are perceivable by the individual located adjacent the television display unit."[248]   This

_____

[247]'253 patent, col.8 ll.3-9.   The specification describes "television signals" as "signals adapted to be displayed by a television set, or any other type of suitable video and/or audio signals."   Id. col.5 ll.41-44.

[248]Id. col.8 ll.9-12.

description indicates that video signals provide information that can be expressed in a perceivable format by a television or other similar device that, among other things, displays images. Furthermore, the description differentiates audio and video television signals, which indicates that the video signals provide the visual or image portion of the information that is expressed by the television or other similar device, and not the sound.[249]

Turning to the extrinsic evidence, a technical dictionary cited by ABC defines "video" as "a visual display, especially on a video display terminal."[250] Similarly, another technical dictionary defines "video" as "the visual (rather than audio) component of a television signal.  In computers <u>video</u> refers to the technology used to render text in graphical images on displays."[251] Consistent with the available evidence, the court concludes that video signals are signals "for the production of images on the video display."

---

[249]Presumably, the audio or sound information is provided by the "data signals."

[250]<u>Webster's New World Dictionary of Computer Terms</u> 606 (5th ed. 1994) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 16).

[251]<u>Microsoft Press Computer Dictionary</u> 297 (1991) (included in ABC's Brief, Docket Entry No. 154, at Exhibit 17).  ABC also cites the <u>21st Century Dictionary of Computer Terms</u>, which according to ABC, defines "video signal" as "[a] signal sent from a video adaptor to the display screen, controlling the shape and brightness of the video image."  ABC's Brief, Docket Entry No. 156, at 23 (citing <u>21st Century Dictionary of Computer Terms</u> 372 (1994)).  ABC did not include a copy of page 372 of this source in Exhibit 20.

2.   A Type of Data Signals

ABC defines video signals as "a type of data signal[s] . . . ." WebEx responds that the claim language and the specification of the '253 patent specifically differentiates between data signals and video signals and, therefore, that video signals are not a type of data signals.[252]  WebEx asserts that video signals carry video information, while data signals may carry any other "non-video information."[253]  Accordingly, WebEx contends that the definition of video signals should explain that video signals are "specifically designated" for communicating video information, "as opposed to general data."

Both parties point to the claim language in support of their respective positions.  Claim 16 states that

> data signals received from each individual's local portion [are] transmitted to each individual's remote computer unit . . ., the data signals being processable by the individual's remote computer unit . . . to generate output signals, the output signals including video signals and being transmittable from the individual's remote computer unit . . . to the individual's local portion.[254]

As WebEx points out, the claim language does not indicate that video signals are a type or subcategory of data signals.  The claim uses the term "data signals" only to describe signals that are

---

[252]WebEx's Brief, Docket Entry No. 156, at 28-29; WebEx's Response, Docket Entry No. 166, at 24.

[253]WebEx's Brief, Docket Entry No. 156, at 29.

[254]'253 patent, claim 16 (as amended) (emphasis added).

transmitted from the local portion to the remote computer unit for processing.  The claim describes the signals transmitted from the remote computer unit back to the local portion as "output signals," of which "video signals" are a constituent.  The claim language, however, does not necessarily foreclose the possibility that video signals could be a type of data signals.  For example, "output signals" could be a type of "data signals."  Therefore, the claim language alone does not provide a definitive answer, and the court looks to the specification for further guidance.  See Markman, 52 F.3d at 979 ("Claims must be read in view of the specification of which they are a part.").

In support of its position WebEx also directs the court to a sentence in the specification describing a particular embodiment of the invention.  The sentence states that "the remote portion 22 . . . provides video signals to the local portion 12 . . . via the sequential communication links 27b and 20a, and data signals to the local portion 12 . . . via the sequential communication links 27a and 16a."[255]  WebEx argues that because the specification describes video signals being relayed from the remote portion to the local portion over one set of communication links (27b and 20a) and data signals being relayed over another set of communication links (27a and 16a), the two types of signals must be mutually exclusive.

ABC counters that WebEx is improperly reading a limitation from the specification into the claim.  See Liebel-Flarsheim Co. v.

_____

[255] '253 patent, col.7 ll.50-66.

-108-

Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004) ("[I]t is improper to read a limitation from the specification into the claims."). ABC also points out that the specification provides that "each of the communication links are shown and described separately herein for the sole purpose of clearly illustrating the information being communicated between the various components.  The communication links may not be separate communication links but may be a single physical communication link."[256]

The court is persuaded by WebEx's argument.  The cited portion of the specification gives no indication that video signals are a type of data signals.  For example, the specification does not say that video signals are transmitted over one communication link while "other" data signals are transmitted over another.  Instead, this portion of the specification simply describes video signals and data signals as two different types of signals.  Therefore, the fact that it is possible to distinguish video signals from data signals and transmit each type of signal over its own respective communication link strongly indicates that the two categories are mutually exclusive.

Moreover, ABC's argument that WebEx is improperly reading a limitation from the specification into the claim is unavailing. WebEx is not arguing that data signals and video signals _must_ be transmitted over separate communications links, as they are in the embodiment described.  In other words, WebEx is not suggesting that

---

[256] '253 patent, col.4 ll.8-13.

an accused device that transmits the two types of signals on a single communication link would not infringe the asserted claim. Instead, WebEx is merely pointing out that the specification indicates that it is <u>possible</u> to distinguish the two types of signals and transmit them separately.  WebEx is properly analyzing how the two terms "video signals" and "data signals" are used in the context of the specification to ascertain their meanings.

Although WebEx has cited only one small excerpt from the specification, the balance of the specification consistently describes data signals and video signals as two distinct types of signals.  For example, the specification explains that the remote computer unit processes incoming data signals "to generate output signals <u>including video and data signals</u>."[257]  This sentence indicates that there are two distinct categories of output signals -- video signals and data signals -- and it gives no indication that video signals are a type or subcategory of data signals.  This sentence also makes clear that the output signals described in claim 16 -- of which video signals are a constituent or type[258] -- are not themselves a type or subcategory of data signals.  Instead, it is the other way around -- data signals are a type or category of output signals.[259]

---

[257]'253 patent, col.8 ll.20-23.

[258]<u>See</u> '253 patent, claim 16 (as amended) (describing the remote computer unit "generat[ing] output signals, the output signals including video signals").

[259]The court does not mean to suggest that <u>all</u> data signals are output signals.  The patent describes data signals that are
(continued...)

-110-

In light of the claim language and specification, the court concludes that video signals are signals "specifically designated for" the production of images on the video display.  They are not a type of "data signals."

3.   <u>Sent from the Remote Computer Unit to the Local Computer Unit</u>

ABC's proposed definition describes video signals as "sent from the remote computer to the local computer/interface unit . . . ."  ABC's proposed definition therefore suggests that all video signals are <u>necessarily</u> sent from the remote computer unit to the local computer unit.  This aspect of ABC's definition is not supported by claim language or the specification.

In claim 16 video signals are mentioned only once, and are described as "being transmittable from the individual's remote computer unit . . . to the individual's local portion."[260]  The claim language therefore indicates that video signals <u>can be</u> sent from the remote computer unit to the local portion, but does not suggest that video signals are confined exclusively to that context.  Furthermore, the specification describes video signals that are transmitted by a "television station block" to the local

---

[259](...continued)
clearly not output signals.  For example, the claim language describes data signals that are transmitted from the local portion to the remote computer unit for processing.  <u>See</u> '253 patent, claim 16 (as amended).  The court intends only to explain that some output signals are data signals.

[260]'253 patent, claim 16 (as amended).

portion.[261]   Therefore, the court concludes that video signals are not necessarily sent from the remote computer unit to the local computer unit and will not include this limitation in its definition.

    4.   Conclusion

    The court concludes that "video signals" are "signals specifically designated for the production of images on the video display."  "Video signals" are not a type of "data signals."

**J.   "Split Personal Computer System"**

    The term "split personal computer system" appears in claim 16 of the '253 patent.  ABC asserts that a "split personal computer system" is "a system where a local computer acts as the input/output device communicating through the remote system controller to operate a remote computer."[262]  WebEx contends that the term should be defined as "a single personal computer that has its components split into an input/output portion and a processing/storage portion the portions spaced a large distance apart and operable to provide the illusion of a complete personal computer."[263]

_____

    [261]See '253 patent, col.6 ll.14-37 (explaining that the local portion may receive television signals from both a "television station block" and the remote computer unit, and defining a "television station block" as "any television station which transmits audio and/or video signals which can be displayed or otherwise output by the television display unit" (emphasis added)).

    [262]ABC's Brief, Docket Entry No. 154, at 23.

    [263]WebEx's Brief, Docket Entry No. 156, at 6.

1.   <u>One or Multiple Computers</u>

ABC's definition of split personal computer system involves two computers:  a local computer and remote computer.  Conversely, WebEx asserts that a split personal computer system consists only of a single personal computer system with its physical components located in two different locations.  WebEx contends that two separate, complete computers cannot constitute a split personal computer system under any circumstances.

Claim 16 provides that the split personal computer system is composed of a "local portion" and a "remote portion."[264]  The remote portion includes one of "a plurality of remote computer units selectively performing the computational portions and the storage portions of the personal computer tasks . . . ."[265]  The local portion is "located remotely from the remote computer units and [is] adapted to selectively perform the video portions and the input/output portions of the personal computer tasks . . . ."[266]

As the quoted language illustrates, the claim does not define or limit the local portion and the remote computer unit in terms of their respective physical components.  Instead, the claim defines the local portion and the remote computer unit in terms of their respective functions when they are linked by the remote system

_____

[264]'253 patent, claim 16 (as amended).

[265]<u>Id.</u>

[266]<u>Id.</u>

-113-

controller and operating collectively as a split personal computer system.  The claim language requires only that, when linked by the remote system controller, the local portion performs the "video portions and the input/output portions of the personal computer tasks," and the remote computer unit performs the "computational portions and the storage portions of the personal computer tasks."[267]  Importantly, the claim does not limit what functions the local portion and remote computer units may perform on their own when they are not linked via the remote system controller. Accordingly, the claim language itself does not limit the split personal computer system to a single personal computer as WebEx asserts.  It does not foreclose the possibility that either or both the local portion and/or the remote computer unit could, on their own, be a complete personal computer.  On the other hand, the claim does not require that either component be a complete computer as ABC's definition suggests.

The court must therefore consider whether the specification and/or prosecution history limits the scope of the term "split personal computer system."  WebEx first points to the summary of the invention included in the specification.  It provides that

> [t]he remote portion of the split personal computer
> system is adapted to perform the heavy computational and
> storage portions of the personal computer tasks, and the
> local portion of the split personal computer system is
> adapted to solely perform the video and the input/output
> portions of the personal computer tasks so that an

---

[267]Id.

> individual manipulating the local portion of the split
> personal computer system <u>is provided with the illusion of
> utilizing a complete personal computer system.</u>[268]

WebEx contends that the necessary implication of the statement that

the invention provides an "illusion" of operating a complete

personal computer system is that the local portion, of which the

user has actual physical possession, cannot itself be a complete

personal computer.

WebEx also cites an excerpt from the prosecution history of

the '253 patent.  In an amendment to a Response to an Office Action

submitted by ABC to the Examiner during the prosecution of the '253

patent, ABC explained that

> [f]rom the standpoint of the user, the inventive concept
> of claims 1 and 18-22 in effect converts the personal
> computer industry from a hardware and software product
> industry to a service industry.  That is, the split
> personal computer system of claim 1 and 18-22 provides a
> service to at least one user and preferably a large
> number of users such that the user(s) do not have to
> purchase an entire personal computer system.  The user(s)
> only have to purchase or obtain a 'local portion' and
> sign up with a service provider, such as AOL, to provide
> the 'remote portion.'
>
> . . .
>
> [O]nce the user signs up with the service provider, the
> user is no longer concerned with many of the problems set
> forth above.  The user does not care whether Intel or AMD
> have come out with a new chip; it is the service
> provider's job to maintain an adequate amount of
> processing power.  Likewise, the user does not care how
> much memory the remote portion has; it is the service
> provider's job to maintain an adequate amount of memory.
> As a practical matter, the user is mainly concerned about

---

[268]'253 patent, col.2 ll.18-26 (emphasis added).

who to complain to if the split personal computer system
is to [sic] slow.[269]

WebEx asserts that because ABC represented to the Examiner that an
advantage of the invention is that a user only has to purchase a
"local portion," and not a complete personal computer, the local
portion alone cannot be a complete personal computer, and the split
personal computer system is necessarily limited to only a single
personal computer.

In response, ABC points to other portions of the specification
and prosecution history that explicitly discuss the possibility
that the local portion may, by itself, be a complete personal
computer.  The specification, in describing a particular embodiment
of the invention, explains that the local portion can include a
"local computer," which "can be any type of suitable computer and
desirably includes temporary and permanent storage devices, and an
operating system loaded thereon."[270]  Furthermore, in the same
amendment to a Response to an Office Action cited by WebEx, ABC
explained to the Examiner that

the local portion can be a personal computer having
communication software thereon for communicating with a

---

[269]Amendment in Response to Office Action Mailed 02/14/2001,
at 6-7 (June 4, 2001) (included in WebEx's Brief, Docket Entry
No. 156, at Exhibit 4D).  These statements refer to prosecution
claims 1 and 18-22.  WebEx asserts that claim 16 was referred to
as claim 34 during prosecution.  WebEx's Brief, Docket Entry No.
156, at 7.  Therefore, these statements do not directly relate to
the claim at issue in this litigation.  These statements do,
however, relate to the term "split personal computer system," as
it is used in other claims in the same patent.  "Because claim
terms are normally used consistently throughout the patent," the
court finds these statements relevant.  Phillips, 415 F.3d at
1314.

[270]'253 patent, col.6 ll.8-10.

remote portion of the split personal computer system.  In this instance, the personal computer may solely perform the video and the input/output portions of the personal computer tasks when acting as a local portion of the split personal computer system, even though the personal computer functioning as the local portion is capable of performing other tasks.[271]

The excerpts from the specification and prosecution history cited by ABC effectively refute WebEx's position.  Accordingly, the court concludes that the split personal computer system is not limited to being a single personal computer with its components physically split and located in different locations as WebEx contends.  The local portion and the remote computer unit may each, on their own, be a complete computer if, when they are linked via the remote system controller, the local portion solely performs the input/output functions and the remote computer unit performs the processing/storage functions.

Although the court disagrees with WebEx's position that the split personal computer system is limited to a single personal computer, the court is not persuaded that ABC has correctly described the local and remote components of the split personal computer system.  Specifically, ABC's definition uses the terms "local computer" and "remote computer" instead of the terms used in the claim itself, i.e., "local portion" and "remote computer unit."[272]

---

[271]Amendment in Response to Office Action Mailed 02/14/2001, at 8 (June 4, 2001) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 4D).

[272]'253 patent, claim 16 (as amended).

By using the terms "local computer" and "remote computer," ABC's definition implicitly suggests that the local portion and the remote computer unit must each consist of a complete computer. Although the specification and prosecution history reveal that the local portion may include or consist of a complete computer, neither suggest that the local portion must include or consist of a complete computer. Moreover, as explained above, ABC explicitly stated during prosecution that one advantage of the claimed invention is that a user need not purchase an entire personal computer, but need only purchase the "local portion."[273]   This statement implies that the "local portion" need not constitute a complete computer. It would therefore be misleading and inaccurate to refer to the local portion as a "local computer." The court will use the term "local portion" in its definition.

Similarly, the cited excerpts from the prosecution history and specification do not require that the remote computer unit be a complete computer. The claim language does not use the term "remote computer," but instead speaks in terms of a "remote computer unit." It would therefore be misleading and inaccurate to refer to the remote computer unit as a "remote computer." The court will use the term "remote computer unit" in its definition.

----

[273]See Amendment in Response to Office Action Mailed 02/14/2001, at 6 (June 4, 2001) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 4D).

2.   Large Distance Apart

During the prosecution of the '253 patent ABC attempted to differentiate prosecution claims 1 and 18-22 from a particular prior art reference known as "Naiff."  In doing so, ABC stated the following:

> [T]he communication means defined in claims 1 and 18-22 and described in the Specification specifies that the remote portion and local portion of the split personal computer system be spaced a large distance apart.  The user interface module 24 and the personal computer 20 of Naiff, on the other hand, are located in close proximity to each other.  For this reason, it is respectfully submitted that Naiff does not teach or suggest a remote portion, as such term is defined in claims 1 and 18-22.[274]

WebEx asserts that, in light of this representation, the definition of split personal computer system should specify that the local portion and the remote computer unit must be "spaced a large distance apart."  ABC argues that including this indefinite distance limitation in the definition is not helpful or necessary because the definition already uses the words "local" and "remote," which adequately convey that the local portion and remote computer unit are physically separated by a significant distance.

The court agrees with ABC.  "Local" means "pertaining to, characteristic of, or restricted to a particular place."[275]

---

[274]Amendment in Response to Office Action Mailed 02/14/2001, at 11 (June 4, 2001) (emphasis added) (included in WebEx's Brief, Docket Entry No. 156, at Exhibit 4D).

[275]Random House Webster's College Dictionary 778 (1999).

"Remote" means "far apart; far distant in space."[276]   These two adjectives effectively communicate that the local portion and remote computer unit are not located in close physical proximity to each other.   Adding the phrase "spaced a large distance apart" is redundant and unnecessary.

   3.   <u>The Functions of the Local Portion and the Remote Computer Unit</u>

   WebEx's proposed definition includes the function of the local portion, describing the local portion as "an input/output portion" of the split personal computer system.   Similarly, ABC's definition describes the local portion as "the input/output device."   The claim itself explains that the local portion "perform[s] the video portions and input/output portions of the personal computer tasks."[277]   Consistent with the claim language, the court's defini-tion will explain that the local portion performs the video and input/output portions of the personal computer tasks.

   WebEx's definition also includes the function of the remote computer unit, describing the remote computer unit as the "processing/storage portion" of the split personal computer system. ABC's definition omits the function of the remote computer unit. Claim 16 states that the remote computer unit "perform[s] the

---

   [276]<u>Id.</u> at 1114.

   [277]'253 patent, claim 16 (as amended).

computational portions and the storage portions of the personal computer tasks."[278]  Consistent with the claim language, the court's definition will explain that the remote computer unit performs the computational and storage portions of the personal computer tasks.

      4.   <u>The Role of the Remote System Controller and the Purpose of the Split Personal Computer Unit</u>

ABC's proposed definition explains that the local portion communicates through the remote system controller to operate the remote computer unit.  WebEx's definition, on the other hand, completely fails to mention the remote system controller, a key component of the split personal computer system.  It also describes the purpose of the split personal computer system as "provid[ing] the illusion of a complete personal computer system."

The court concludes that this aspect of ABC's proposed definition better captures the core purpose of the split personal computer system described in claim 16.  It also describes the role of the remote system controller, a key component of the split personal computer system, while WebEx's definition omits any mention of the remote system controller.  Accordingly, the court concludes that the definition of split personal computer system should explain that the local portion communicates through a remote system controller to operate the remote computer unit.

---

[278]<u>Id.</u>

5.   <u>Conclusion</u>

The court concludes that a "split personal computer system" is "a system where a local portion, which performs the video and input/output portions of the personal computer tasks, communicates through a remote system controller to operate a remote computer unit, which performs the computational and storage portions of the personal computer tasks."

## IV.   <u>ORDER</u>

The court will conduct a scheduling conference on October 16, 2009, at 2:00 p.m., in Court Room 9-B, 9th Floor, United States Courthouse, 515 Rusk Street, Houston, TX 77002.  The parties will submit a proposed amended docket control order by October 14, 2009. If the parties cannot agree, they will explain their disagreements in a paper to be filed at the same time.

**SIGNED** at Houston, Texas, on this 30th day of September, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-122-