IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AUTOMATED BUSINESS COMPANIES,    §
                                 §
              Plaintiff,          §
                                 §
v.                               §    CIVIL ACTION NO. H-06-1032
                                 §
WEBEX COMMUNICATIONS, INC.,      §
                                 §
              Defendant.          §

### MEMORANDUM OPINION AND ORDER

Automated Business Companies ("ABC") brought this action against WebEx Communications, Inc. ("WebEx") alleging patent infringement involving certain claims of United States Patent Nos. 6,360,253 ("'253 patent"), 6,999,945 ("'945 patent"), and 7,016,943 ("'943 patent"). Pending before the court is Defendant WebEx Communications, Inc.'s Motion for Summary Judgment of Noninfringement of United States Patent Nos. 6,360,253, 6,999,945, and 7,016,943 and Invalidity of United States Patent No. 6,999,945 (Docket Entry No. 203). For the reasons explained below, the court will grant in part and deny in part WebEx's motion.

### I.  Background

This action concerns allegations by ABC that various computer software products and services offered by WebEx infringe certain claims of the '253, '945, and '943 patents ("the Freeny patents"). The '253 patent and the '943 patent, which share a common specification except for the abstract, are directed to a "split

personal computer system."[1]   The '945 patent is directed to a "multiple customer and multiple location PC service provider system."[2] All three patents involve similar inventions that enable an individual user to control or utilize one or more remotely located computer units via a local interface device.

**A.    Patent Background**

Each of the three patents asserted in this action assert priority to a common parent, United States Patent No. 6,243,743 ("'743 patent"), the application for which was filed on January 29, 1998.[3]   The '253 patent issued on March 19, 2002, and is a continuation of the '743 patent.[4]   The '945 patent issued on February 14, 2006, and is a continuation-in-part of the '743 patent.[5]   The '943 patent issued on March 21, 2006, and is a continuation of application No. 10/050,624, now abandoned, which was a continuation of the '253 patent.[6]

---

[1]See '253 patent, Exhibit 1 to Defendant WebEx Communications, Inc.'s Motion for Summary Judgment of Noninfringement of United States Patent Nos. 6,360,253, 6,999,945, and 7,016,943 and Invalidity of United States Patent No. 6,999,945 and Brief in Support ("WebEx's Brief"), Docket Entry No. 203, at cover; see '943 patent, Exhibit 3 to WebEx's Brief, at cover.

[2]'945 patent, Exhibit 2 to WebEx's Brief, Docket Entry No. 203, at cover.

[3]See '253 patent, at cover; '945 patent, at cover; '943 patent, at cover.

[4]'253 patent, at cover.

[5]'945 patent, at cover.

[6]'943 patent, at cover.

Although the asserted claims vary in important ways, each claim generally outlines an invention made up of or utilizing three elements: (1) the local element, (2) the intermediate element, and (3) the remote element. The local element is an interface device physically located in the same place as the user through which the user inputs commands and receives output, but which itself has minimal functionality and does not perform the computing functions desired by the user.[7]

The intermediate element -- referred to in the asserted patent claims as a "remote system controller,"[8] "network control computer,"[9] or "website"[10] -- essentially facilitates the connection between the local element and the remote element.[11] In all of the asserted claims the intermediate element performs at least two key

---

[7]See '253 patent, col.2 ll.20-23, col.4 ll.23-30; '945 patent, col.4 l.48 - col.5 l.13, col.5 l.51 - col.6 l.4; '943 patent, col.2 ll.23-26, col.4 ll.28-35.

[8]'253 patent, claim 16 (as amended) (full text of claim 16, as amended, is included in Ex Parte Examination Certificate, Exhibit 1 to WebEx's Brief, Docket Entry No. 203, at 7); '943 patent, claim 1 (as amended) (full text of claim 1, as amended, is included in Ex Parte Reexamination Certificate, Exhibit 3 to WebEx's Brief, at 6).

[9]'943 patent, claim 2 (as amended) (full text of claim 2, as amended, is included in Ex Parte Reexamination Certificate, Exhibit 3 to WebEx's Brief, Docket Entry No. 203, at 6).

[10]'945 patent, at col.10 ll.8-48.

[11]See '253 patent, col.5 ll.4-24, col.7 ll.43-56; '945 patent, col.4 ll.19-48, col.5 ll.24-30, col.5 ll.42-50, col.6 ll.14-64; '943 patent, col.5 ll.8-28, col.7 ll.48-61.

functions.  First, the intermediate element receives logon commands from the local element and checks their validity.[12]  Second, if the logon commands are valid, the intermediate element establishes the connection between the local element and the appropriate computer unit in the remote element, allowing the user to operate the remote computer unit.[13]

The remote element is made up of one or more computer units physically located remotely from the user.[14]  The remote element

---

[12]'253 patent, claim 16 (as amended) ("a remote system controller . . . adapted to receive remote logon commands [and] check the remote logon commands for validity"); '943 patent, claim 1 (as amended) ("receiving and checking the validity, by the remote system controller, a valid logon command"); '943 patent, claim 2 (as amended) ("a network control computer . . . to connect the remote computer unit to the local computer unit . . . upon receipt and checking the validity of a valid logon command identifying the remote computer unit"); '945 patent, claims 3-5 ("receiving, by the website, a valid logon command . . . whereby the website associates the valid logon command with the remote computer unit").

[13]'253 patent, claim 16 (as amended) ("a remote system controller . . . adapted to . . . interface each individual's local portion with the individual's remote computer unit . . . thereby permitting valid data signals received from each individual's local portion to be transmitted to each individual's remote computer unit"); '943 patent, claim 1 (as amended) ("interfacing, through the remote system controller, the local computer unit with the remote computer unit to permit the local computer unit to operate the remote computer unit"); '943 patent, claim 2 (as amended) ("a network control computer . . . to connect the remote computer unit to the local computer unit permitting the local computer unit to operate the remote computer unit"); '945 patent, claims 3-5 ("receiving, by the website, data signal instructions from the interface unit; and sending the data signal instructions from the website to the remote computer unit whereby the data signal instructions act to remotely operate the remote computer unit").

[14]'253 patent, col.2 ll.27-28; '943 patent, col.2 ll.30-31; see '945 patent, col.6 l.60 - col.7 l.57.

performs the computing functions desired by the user.[15]  Output from the remote element is relayed back to the user via the intermediate element and is displayed or otherwise expressed in a usable format by the local element.[16]  Data is transmitted from one element to another via the internet or other similar connection.[17]

In summary, the invention allows a user "to remotely operate the remote computer unit as if [he] were sitting in front of the remote computer unit and actually operating the remote computer unit."[18]  Although the user is in one physical location and the computer unit performing the desired computational tasks are in another physical location, the invention provides "the illusion of utilizing a complete personal computer system."[19]

**B.   Procedural History**

ABC initiated this action on March 27, 2006, asserting causes of action against multiple defendants, including WebEx, for infringement of claim 16 of the '253 patent, claims 1-5 of the '945 patent, and claims 1 and 2 of the '943 patent.[20]  At the request of

_____

[15]'253 patent, col.2 ll.18-20; '943 patent, col.2 ll.21-23; <u>see</u> '945 patent, col.7 l.58 - col.8 l.7.

[16]'253 patent, col.2 ll.47-58; '943 patent, col.2 ll.50-61; <u>see</u> '945 patent, col.7 ll.58-61.

[17]'253 patent, col.3 l.66 - col.4 l.13, col.5 ll.4-9; '943 patent, col.4 ll.4-17, col.5 ll.9-14; <u>see</u> '945 patent, col.7 ll.58-61.

[18]'945 patent, claims 3-5.

[19]'253 patent, col.2 ll.25-26; '943 patent, col.2 ll.28-29.

[20]Original Complaint, Docket Entry No. 1, ¶ 2.4.

the parties the court granted a stay of the action on September 6, 2006, pending an <u>ex parte</u> reexamination of the asserted patent claims by the United States Patent and Trademark Office ("USPTO").[21]

During the reexamination of the '253 patent, ABC amended claim 16 to clarify that the "remote system controller" was not a passive device, but instead that it was capable of actively receiving and checking logon commands and actively interfacing the local element and the remote element.[22]  On March 27, 2009, the USPTO completed the <u>ex parte</u> reexamination of the '253 patent, concluding that claim 16, as amended, was patentable.[23]

For the '943 patent ABC made amendments to claims 1 and 2 similar to the amendments made to claim 16 of the '253 patent.  The amendments clarified that the "remote system controller" of claim 1 and the "network control computer" of claim 2 are active devices, not mere passive switches or pass-through devices.[24]  The amendments made explicit that the claimed "remote system controller" and the

---

[21]Agreed Order, Docket Entry No. 102.  <u>See also</u> Order, Docket Entry No. 105.

[22]Notice of Intent to Issue *Ex Parte* Reexamination Certificate, *Ex Parte* Reexamination of U.S. Patent No. 6,360,253, Control No. 90/008,052 (March 27, 2009), Exhibit 10 to Plaintiff ABC's Opening Claim Construction Submission, Docket Entry No. 154, pp. 4-9.

[23]<u>Id.</u> at 1-2.

[24]<u>See</u> Notice of Intent to Issue *Ex Parte* Reexamination Certificate, *Ex Parte* Reexamination of U.S. Patent No. 7,016,943, Control No. 90/008,053 (March 27, 2009), Exhibit 11 to Plaintiff ABC's Opening Claim Construction Submission, Docket Entry No. 154, pp. 4, 6, 8-10 (describing amendments to claims 1 and 2).

"network control computer" were capable of receiving and checking logon commands.[25]  On March 27, 2009, the USPTO announced that it found claims 1 and 2 patentable as amended, concluding the <u>ex parte</u> reexamination of the '253 patent.[26]

With regard to the '945 patent, the USPTO concluded that claims 1 and 2 were not patentable, but that claims 3-5 were patentable as originally issued.[27]  Although ABC disagreed with the USPTO's conclusion as to claims 1 and 2, it agreed to cancel claims 1 and 2 to "expedite the confirmation of patentability of claims 3-5."[28]  The '945 patent emerged from reexamination on March 30, 2009, with claims 1 and 2 canceled, but with claims 3, 4, and 5 confirmed as patentable without amendment or clarification.[29]

On November 4, 2008, at the request of the parties the court entered an Order lifting the stay.[30]  On June 2, 2009, ABC amended

_____

[25]<u>Id.</u>

[26]<u>Id.</u> at 1-2.

[27]Final Office Action, *Ex Parte* Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (Oct. 3, 2008), Exhibit 6G to Defendants' Brief in Support of Their Proposed Claim Constructions for U.S. Patent Nos. 6,360,253; 7,016,943; and 6,999,945 ("WebEx's Claim Construction Brief"), Docket Entry No. 156, p. 7.

[28]Response to Office Action in *Ex Parte* Reexamination, *Ex Parte* Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (Nov. 26, 2008), Exhibit 6H to WebEx's Claim Construction Brief, Docket Entry No. 156, pp. 4-5.

[29]<u>See</u> Notice of Intent to Issue *Ex Parte* Reexamination Certificate, *Ex Parte* Reexamination of U.S. Patent No. 6,999,945, Control No. 90/008,122 (March 30, 2009), Exhibit 6J to WebEx's Claim Construction Brief, Docket Entry No. 156.

[30]Order, Docket Entry No. 128.

its complaint to, among other things, reflect the fact that claims 1 and 2 of the '945 patent had been canceled during reexamination.[31]  ABC now asserts that WebEx has infringed and continues to infringe claim 16 of the '253 patent; claims 1 and 2 of the '943 patent; and claims 3, 4, and 5 of the '945 patent.[32]

## C.  The **Markman** Rulings

On September 30, 2009, the court issued a Memorandum Opinion on Claim Construction construing a number of disputed terms (Docket Entry No. 190).  On October 30, 2009, the court entered a Memorandum Opinion and Order on claim construction, revising in part the previous Memorandum Opinion (Docket Entry No. 197). Several of the construed terms are relevant to the pending motion.

The most significant term to the present motion is "logon command," which appears in all of the asserted claims.[33]  The court construed "logon command" as "identifying information, such as a name or data, associated with and enabling operation of a remote computer unit, and which is checked for validity by the [remote

---

[31]See First Amended and Supplemental Complaint for Infringement of United States Patent Nos. 6,360,253, 6,999,945, and 7,016,943, Docket Entry No. 171.

[32]Id. ¶ 4.2.

[33]The term "logon command" literally appears only in claim 1 of the originally issued version of the '945 patent.  Claims 3, 4, and 5, however, are written in dependent form and all depend on claim 1.  Although ABC canceled claim 1 during reexamination, claims 3, 4, and 5 survived reexamination without amendment. Therefore, the text of claim 1, including the term "logon command," is incorporated by dependent claims 3, 4, and 5.

system controller (claim 16 of the '253 patent, claim 1 of the '943 patent)]/[network control computer (claim 2 of the '943 patent)]/[website (claim 1 of '945 patent)]."[34]

The court construed "website," as that term is used in the '945 patent, as "one or more servers operating together that (1) can be located on the Internet by use of a Uniform Resource Locator (URL), (2) host one or more web pages retrievable by a web browser through hypertext transfer protocol ("HTTP") and hypertext markup language ("HTML") interpretation, (3) validate logon commands, and (4) send and receive data signal instructions."[35] The court further stated that the same website both receives valid logon commands and receives and sends the data signals that control the remote computer unit.[36]

The court concluded that the term "remote system controller" means "a computer or controller that checks the validity of logon commands and interfaces the local portion/computer unit with the remote computer unit to permit the local portion/computer unit to operate the remote computer unit, but excluding passive devices that merely forward data packets without regard for their content."[37]

---

[34]Memorandum Opinion on Claim Construction, Docket Entry No. 190, p. 54.

[35]Id. at 42.

[36]Id. at 42-43.

[37]Id. at 83.

The court construed "network control computer" as "a computer that stores a list of access codes for individuals authorized to use the remote computer units, checks the validity of logon commands, and interfaces the local computer unit with the remote computer unit to permit the local computer unit to operate the remote computer unit, but excluding passive devices that merely forward data packets without regard for their content."[38]

On February 9, 2010, WebEx filed the pending Motion for Summary Judgment (Docket Entry No. 203). ABC filed a Response on March 2, 2010 (Docket Entry No. 211). The parties have also filed a Reply and a Surreply (Docket Entry Nos. 212 and 216).

## II.  Summary Judgment Standard

The court may grant summary judgment if the movant establishes that there is no genuine dispute about any material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An examination of substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). Material facts are those facts that "might affect the outcome of the suit under the governing law." Id. A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could resolve the dispute in the nonmoving party's favor. Id. at 2511. The standard for summary judgment is no

---

[38]Id. at 95.

different in a patent case than in any other civil case.  <u>See</u> <u>Johnston v. IVAC Corp.</u>, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).

The movant has the initial burden to inform the court of the basis for summary judgment.  <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2553 (1986).  When the movant seeks summary judgment on a claim for which it does not bear the burden of proof at trial, it may satisfy its initial burden in two ways.  First, it may present evidence negating one or more elements of the nonmoving party's claim.  <u>See</u> <u>id.</u>  Alternatively, it may simply point out the absence of evidence to support the nonmoving party's claim.  <u>Id.</u> at 2254; <u>Johnston</u>, 885 F.2d at 1577.  On the other hand, if the moving party seeks summary judgment on a claim or defense for which it bears the burden of proof at trial, it must prove each and every element of its claim or defense such that "no reasonable jury could find otherwise."  <u>Eli Lilly & Co. v. Barr Labs., Inc.</u>, 251 F.3d 955, 962 (Fed. Cir. 2001).  <u>See also</u> <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986) (explaining that a party seeking summary judgment on a claim for which it bears the burden of proof at trial "must establish beyond peradventure all of the essential elements of the claim").

If the movant makes the required initial showing, the burden shifts to the nonmoving party to show by affidavits, depositions, answers to interrogatories, admissions, or other evidence that summary judgment is not warranted because genuine fact issues exist.  <u>See</u> <u>Celotex Corp.</u>, 106 S.Ct. at 2254.  In reviewing the

evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S.Ct. 2097, 2110 (2000).

### III.  <u>WebEx's Motion for Summary Judgment on Noninfringement</u>

WebEx argues that it is entitled to summary judgment on ABC's infringement claims because ABC cannot prove either literal infringement or infringement under the doctrine of equivalents. WebEx first argues that none of the accused products infringe because none of the WebEx products uses a "logon command" as construed in the court's <u>Markman</u> order, and which is required by each of the asserted patent claims.  Second, WebEx argues that the court should enter summary judgment regarding the '253 and '943 patents because no single device in WebEx's products interfaces remote control signals between the local and remote computer and checks the validity of the logon command, as required by those patents under the court's claim construction.  Third, WebEx argues that the '945 patent is invalid for failing to comply with the written description requirement of 35 U.S.C. § 112 ¶ 1.

### A.   Non-Infringement -- Applicable Law

A patent claim is infringed if a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any

-12-

patented invention during the term of the patent therefor . . . ."
35 U.S.C. § 271(a).  Analysis of infringement involves a two-step
process.  <u>Syntex (U.S.A.) LLC v. Apotex, Inc.</u>, 407 F.3d 1371, 1377
(Fed. Cir. 2005).  First, the court must interpret the claim.  <u>Id.</u>
Claim construction is a matter of law for the court.  <u>Markman v.</u>
<u>Westview Instruments, Inc.</u>, 116 S.Ct. 1384, 1396 (1996); <u>Syntex</u>,
407 F.3d at 1377.  Once the claim has been construed, it must be
compared to the allegedly infringing device.  <u>Syntex</u>, 407 F.3d at
1377.  Whether the accused device reads onto the properly construed
claim is a question of fact.  <u>Id.</u> at 1377-78.  The party asserting
infringement bears the burden of proof.  <u>Applied Med. Resources</u>
<u>Corp. v. U.S. Surgical Corp.</u>, 448 F.3d 1324, 1333 (Fed. Cir. 2006).

    1.   <u>Literal Infringement</u>

An accused device may infringe a patent claim either literally
or under the doctrine of equivalents.  "Literal infringement of a
claim exists when every limitation recited in the claim is found in
the accused device, i.e., when the properly construed claim reads
on the accused device exactly."  <u>Cole v. Kimberly-Clark Corp.</u>, 102
F.3d 524, 532 (Fed. Cir. 1996).  If even one limitation is missing
or not met as claimed, there is no literal infringement.  <u>Moba,</u>
<u>B.V. v. Diamond Automation, Inc.</u>, 325 F.3d 1306, 1313 (Fed. Cir.
2003).  Summary judgment on literal infringement is proper "when no
genuine issue of material fact exists, in particular, when no
reasonable jury could find that every limitation recited in the

-13-

properly construed claim either is or is not found in the accused device." Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1164 (Fed. Cir. 2004).

2.    Infringement Under the Doctrine of Equivalents

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 122 S.Ct. 1831, 1838 (2002).   A device infringes a patent claim under the doctrine of equivalents if it contains "each limitation of the claim or its equivalent." Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc., 305 F.3d 1303, 1315 (Fed. Cir. 2002) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 117 S.Ct. 1040, 1054 (1997)).   "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." Id.  The doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. Warner-Jenkinson, 117 S.Ct. at 1049.   The test for equivalence is whether the accused structure performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. Id. at 1054. Summary judgment of noninfringe-ment under the doctrine of equivalents is appropriate if "no reasonable jury could determine two elements to be equivalent."

-14-

Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1360 (Fed. Cir. 2002) (quoting Warner-Jenkinson, 117 S.Ct. at 1053 n.8).

Two limitations on the doctrine of equivalents are relevant in this case. First, the "all limitations rule" provides that the doctrine of equivalents does not apply if the doctrine would vitiate an entire claim limitation. Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1321 (Fed. Cir. 2003). In other words, a device does not infringe if a claim limitation is "totally missing from the accused device." DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1332 (Fed. Cir. 2001). However, a "[o]ne-to-one correspondence of components is not required." Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 149 F.3d 1309, 1320 (Fed. Cir. 1998). Therefore, if separate claim limitations are "combined into a single element of the accused device," the accused device may still infringe under the doctrine of equivalents so long as the differences between the claim elements and the single element of the accused device are "insubstantial." Eagle Comtronics, 305 F.3d at 1317.

Second, the doctrine of prosecution history estoppel prohibits the patent holder from asserting that certain subject matter is equivalent to a claim element if that subject matter was surrendered during the prosecution of the patent. Id. at 1315-16. The estoppel may be based on an argument made by the patent holder during prosecution in support of patentability, for example, to

-15-

distinguish the claimed invention from a particular prior art reference. Id. at 1316 (citing Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed. Cir. 1999)).  If such an argument-based estoppel is found to apply to a particular claim limitation, it will apply to all claims in the same patent in which that limitation appears. Id. (citing Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1584 (Fed. Cir. 1995)).  For argument-based estoppel to apply, "the prosecution history must evince a 'clear and unmistakable surrender of subject matter.'"  Id. (quoting Pharmacia & Upjohn Co. v. Mylan Pharm., Inc., 170 F.3d 1373, 1377 (Fed. Cir. 1999)).

**B.   Analysis**

WebEx first argues that none of the accused products infringe because none of the WebEx products uses a "logon command" as the term was construed in the court's Markman order, and which is required by each of the asserted patent claims.

### 1.   Literal Infringement

WebEx's products literally infringe ABC's patents only if "every limitation recited in the claim is found in the accused device." See Cole, 102 F.3d at 532.  WebEx argues that it does not literally infringe the patents because its products do not use logon commands, which are a limitation recited in each of the

-16-

claims ABC has asserted against WebEx.[39]  In its <u>Markman</u> order the court construed "logon command" as "identifying information, such as a name or data, associated with and enabling operation of a remote computer unit, and which is checked for validity by the [remote system controller (claim 16 of the '253 patent, claim 1 of the '943 patent)]/[network control computer (claim 2 of the '943 patent)]/[website (claim 1 of the '945 patent)]."[40]  The essential elements of this construction are that the logon command must enable operation of the remote computer unit, and must be checked for validity by an intermediate element between the local computer and the remote computer.  WebEx argues that because none of its products use an intermediate element to check the validity of a logon command that enables operation of the remote computer, its products do not use logon commands as required by the asserted patent claims.

---

[39]<u>See</u> '253 patent, claim 16 ("a remote system controller . . . adapted to receive remote logon commands, check the remote logon commands for validity, and interface each individual's local portion with the individual's remote computer unit"); '945 patent, claims 3, 4, and 5 (incorporating the limitations of canceled claim 1, which states, "receiving, by the website, a valid logon command from the interface unit whereby the website associates the valid logon command with the remote computer unit"); '943 patent, claim 1 ("receiving and checking the validity, by the remote system controller, a valid logon command") and claim 2 ("the remote computer unit to connect the remote computer unit to the local computer unit permitting the local computer unit to operate the remote computer unit upon receipt and checking the validity of a valid logon command identifying the remote computer unit").

[40]Memorandum Opinion on Claim Construction, Docket Entry No. 190, p. 54.

2.  How WebEx's Products Work

ABC has asserted claims against three WebEX products -- PCNow, Access Anywhere, and Remote Access -- that allow use of unattended remote computers from a local computer.  These three products, while offering different functionality, employ a similar process to allow a user to operate a remote computer from a local computer. First, the user must enter a username and password into a WebEx web page for the appropriate product.[41]  If the username and password are accepted, the web page will display a list of unattended remote computers that may be logged into from that account.[42]  If the user clicks on one of the listed computers, a WebEx Collaboration Server will establish connections with both the local computer and the remote computer.[43]  At this point the user of the local computer cannot see or control any part of the unattended remote computer.[44] To gain operation of the remote computer the user enters an access code into a dialogue box on the local computer.[45]  The information packet containing the access code will pass through the

---

[41]Deposition of Jeff Luo, Exhibit 8 to WebEx's Brief, Docket Entry No. 203, at 109:13-21.

[42]Id. at 109:5-19, 110:15-20.

[43]Deposition of David Knight, Exhibit 4 to WebEx's Brief, Docket Entry No. 203, at 26:17-27:22.

[44]Id. at 27:23-28:13.

[45]Deposition of Jeff Luo, Exhibit 8 to WebEx's Brief, Docket Entry No. 203, at 116:13-117:21, 129:3-18.

collaboration server to the remote computer, but the collaboration server does not open or evaluate the information packet in any way.[46] When the access code reaches the remote computer, the remote computer checks the validity of the access code, and if it is valid the user will be able to operate the remote computer from the local computer.[47] Until the remote computer confirms the validity of the access code, the user of the local computer cannot operate or see any part of the remote computer.[48]

ABC has also asserted claims against a WebEx product called Support Center Remote Support, which allows a customer support representative ("CSR") to have some use of an attended remote computer, generally in order to help diagnose software support issues the end user is having with the remote computer. In order for a CSR to view or operate a customer's remote computer, the CSR must first enter a valid username and password into the WebEx web page for the Remote Support product.[49] If a customer requests assistance from the CSR and agrees to take part in a WebEx meeting, the CSR can establish a meeting at a collaboration server, and the customer's attended remote computer joins that meeting.[50] At this

---

[46]Id. at 129:6-23.

[47]Id. at 130:19-25.

[48]Id. at 131:4-8.

[49]Deposition of David Knight, Exhibit 4 to WebEx's Brief, Docket Entry No. 203, at 134:25-135:4.

[50]Id. at 26:1-27:22, 131:6-25, 138:19-20.

point the CSR cannot see or control any part of the remote computer.[51]  In order to gain any view of or control over the remote computer, the CSR must send a permission request to the remote computer, and the customer must agree to the request.[52]  It is only when the customer has agreed to the request and the customer's computer has validated the request that the CSR can view or operate any part of the remote computer.[53]  The customer can retake control of the remote computer at any time during the meeting.[54]

    3.   "Enabling Operation"

WebEx argues that because its products for both attended and unattended remote computers do not allow the local computer user to view or operate the remote computer until after the request or access code has been validated by the remote computer, rather than by any intermediate element, its products do not employ "logon commands" as required by each of the asserted patent claims.  The court finds this argument persuasive.  While the WebEx products do employ intermediate elements -- the WebEx web pages and the collaboration servers -- that accept identifying information from the local computer and transfer information between the local

---

[51]Id. at 145:7-146:15.

[52]Id. at 148:4-150:17.

[53]Id. at 164:16-165:11.

[54]Id.

computer and the remote computer, these intermediate elements do not check the validity of any identifying information that enables operation of the remote computer.  Because operation of the remote computer is not enabled until the access code or request is validated at the remote computer itself, the court concludes that the WebEx products do not use logon commands as required by the asserted patent claims.

ABC argues that WebEx's argument is based on an incorrect interpretation of the court's construction of "logon command" to the effect that the logon command has to be the last necessary step causing operation of the remote computer unit.[55]  ABC argues that "the phrase 'enables the operation of' simply means that a logon command is checked by the remote system controller or website as a necessary step in the process that results in operation of the remote computer unit."[56]  Under this interpretation, if the validation of a username, password, or access code by the WebEx web page or collaboration server is a necessary step in the process by which the local user gains operation of the remote computer, that username, password, or access code is a logon command as required by the asserted patent claims.  Since all of WebEx's accused products validate some form of identifying information at an

_____

[55]Plaintiff ABC's Response to Defendant WebEx's Motion for Summary Judgment ("ABC's Response"), Docket Entry No. 211, p. 3.

[56]Id.

-21-

intermediate stage between the local computer and the remote computer, WebEx's noninfringement argument would fail if ABC's interpretation of the claim construction were correct.

The court is not persuaded by ABC's argument, which disregards the distinction the court drew in its <u>Markman</u> order between enabling operation and enabling access.[57]  After considering the parties' claim construction arguments, the court stated, "[I]t is therefore operation, not access, that is enabled by the logon command."[58]  The court's Order required that something more than access is enabled by validation of the logon command.  But ABC's interpretation would include "enabling access" under its broad definition of "enabling operation," because obtaining access to the remote computer is clearly "a necessary step in the process that results in operation of the remote computer unit."  ABC's interpretation is not consistent with the court's construction of "logon command," which requires more than mere access.

A more physical analogy may clarify the point.  If a driver's locked car is inside a locked garage, and the driver gives her garage clicker to her neighbor, she may have enabled the neighbor to access the car, but she has not enabled the neighbor to operate the car unless the neighbor also has the car keys.  Under ABC's interpretation of "enabling operation" as "a necessary step in the process that results in operation," the driver would have enabled

---

[57]Memorandum Opinion on Claim Construction, Docket Entry No. 190, pp. 47-54.

[58]<u>Id.</u> at 50.

operation of the car by giving the neighbor the garage clicker, even though the neighbor would still be unable to operate the car.

ABC's appeals to dictionary definitions of "enable" are not persuasive. <u>Black's Law Dictionary</u>, for example, defines "enable" as "to give power to do something; to make able."[59] The validation of a logon command, therefore, must give the user the power to operate the remote computer. The validation performed by intermediate elements in the accused WebEx products, however, does not by itself give the local user the power to operate or even view the remote computer; the user is not given that power until validation of the request or access code has occurred at the remote computer. Because the validation that occurs in the intermediate elements does not give the user the power to operate the remote computer, the validation does not "enable operation" of the remote computer. The information validated at intermediate elements in the WebEx products, therefore, does not qualify as a "logon command" under the court's construction of that term.

### 4.   <u>Infringement Under the Doctrine of Equivalents</u>

Even if WebEx's products do not literally infringe the asserted patent claims, they could still infringe under the doctrine of equivalents if the products contain "each limitation of the claim or its equivalent." <u>Eagle Comtronics</u>, 305 F.3d at 1315. Because the court has concluded that the WebEx products do not employ "logon commands" as required by the asserted claims, the

---

[59]<u>Black's Law Dictionary</u>, 7th ed. (1999).

relevant question under the doctrine of equivalents is whether WebEx's products contain an equivalent element.  "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art."  Id.  WebEx argues that the design of the WebEx products requiring final validation at the remote computer "ensures that the remote computer itself always has a say in who can and cannot operate it."[60]  ABC has not provided the court with reasons to conclude that the difference between validating logon commands at an intermediate element versus at the remote computer is an insubstantial difference.  The court therefore concludes that the differences between the two designs are not insubstantial.

Another test articulated for equivalence is whether the accused structure performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention.  Warner-Jenkinson, 117 S.Ct. at 1054.  The court is not persuaded that the WebEx products perform in substantially the same way as described in the asserted patent claims.  Validating the logon information that enables operation of the remote computer at the remote computer itself, as opposed to at an intermediate element, takes a different approach than the Freeny patents at addressing a problem faced by both the WebEx products and the Freeny patents -- allowing a local user to operate a remote

---

[60]WebEx's Brief, Docket Entry No. 203, p. 2.

computer without endangering the security of the remote computer. The Freeny patents place the responsibility for validating the logon information on an intermediate element, while the WebEx products place the ultimate responsibility at the remote computer. While the end result may be similar, the WebEx products and the Freeny patents do not get there in substantially the same way. The court concludes that finding equivalence here would violate the "all limitations rule" in that it would vitiate the claim limitation requiring logon commands found in each of the asserted patent claims. See Lockheed Martin, 324 F.3d at 1321.

ABC essentially concedes the issue of equivalents if the court does not agree with its interpretation of the phrase "enabling operation." ABC states, "ABC agrees that it has not asserted a doctrine of equivalents argument for WebEx's self-awarded and incorrect construction of the term 'enable.'"[61] The court has already concluded that WebEx's interpretation of "enabling operation" is more consistent with the court's Markman order than the overly broad interpretation urged by ABC. Therefore, the court concludes that ABC has not advanced a convincing argument for why the equivalent of logon commands, as required by the asserted claims, is present in the WebEx products.

The court concludes that no reasonable jury could determine that the logon validation procedures described in the Freeny

---

[61]ABC's Response, Docket Entry No. 211, p. 15.

patents and the logon validation procedures practiced by the WebEx products are equivalent. Summary judgment is therefore appropriate. See Leggett & Platt, 285 F.3d at 1360 (Fed. Cir. 2002).

WebEx also argues that ABC should be estopped from asserting a doctrine of equivalents argument because it advanced arguments during the reexamination that limited its claims regarding logon commands to exclude designs in which logon commands are validated at the remote computer. Although WebEx has presented some persuasive evidence, the court is not convinced that the evidence necessarily shows that ABC has made a "clear and unmistakable surrender of subject matter," as is required for prosecution history estoppel to apply. See Eagle Comtronics, 305 F.3d at 1316. In any event, the court has already concluded that WebEx is entitled to summary judgment on ABC's doctrine of equivalents claims on other grounds.

    5.   Conclusion

For the reasons explained above, the court concludes that the accused WebEx products do not employ logon commands or the equivalent. Therefore, the WebEx products do not infringe the asserted claims either literally or under the doctrine of equivalents.

**C.  Remote System Controller**

WebEx argues that it does not infringe claim 16 of the '253 patent or claim 1 of the '943 patent, both of which require a

"remote system controller," because the accused WebEx products do not employ a "remote system controller" as the term was defined in the court's <u>Markman</u> order.  WebEx argues that it "does not use a single device to interface remote control signals between the local and remote computers and to check the validity of a logon command,"[62] as is required by the court's definition of "remote system controller."

Both claim 16 of the '253 patent and claim 1 of the '943 patent require a "remote system controller" that plays an important intermediary role between the local computer unit and the remote computer unit.[63]  In its <u>Markman</u> order the court concluded that "remote system controller" means "a computer or controller that checks the validity of logon commands and interfaces the local portion/computer unit with the remote computer unit to permit the local portion/computer unit to operate the remote computer unit, but excluding passive devices that merely forward data packets

---

[62]WebEx's Brief, Docket Entry No. 203, p. 15.

[63]'253 patent, Claim 16 as amended ("the remote portion comprising:  a remote system controller established on the World Wide Web and communicating with the local portions via the Internet, adapted to receive remote logon commands, check the remote logon commands for validity, and interface each individual's local portion with the individual's remote computer unit . . .");  '943 patent, Claim 1 as amended ("the method comprising the steps of:  establishing a remote system controller on an internet such that the remote system controller is remote from the local computer unit and the remote computer unit; receiving and checking the validity, by the remote system controller, a valid logon command; and interfacing, through the remote system controller, the local computer unit with the remote computer unit to permit the local computer unit to operate the remote computer unit . . .").

without regard for their content."[64]  In arriving at this definition, the court explicitly chose the singular language of "computer or controller" over the plural term "one or more computer elements" suggested by ABC.[65]  The court confirmed this choice in the second <u>Markman</u> Order, in which it rejected ABC's argument that the court declare that a remote system controller "is not limited to a single device or any particular hardware or software configuration."[66]  After concluding that there was no support in the intrinsic evidence for ABC's position, and that the extrinsic evidence was at best mixed, the court stated that it was "not persuaded that it should clarify its definition by declaring that a 'remote system controller' is not limited to a single device."[67]

WebEx argues that its products do not employ any single device that both checks the validity of logon commands and interfaces the local computer unit with the remote computer unit, and therefore that it does not infringe claim 16 of the '253 patent and claim 1 of the '943 patent.  The court agrees for the same reasons discussed above concerning logon commands.  The WebEx collaboration servers, the intermediate element in the accused WebEx devices, do

---

[64]Memorandum Opinion on Claim Construction, Docket Entry No. 190, pp. 83-84.

[65]<u>Id.</u> at 73.

[66]Memorandum Opinion and Order, Docket Entry No. 197, pp. 9-15.

[67]<u>Id.</u> at 15.

not validate personal information that enables operation of the remote computer, and therefore they do not validate logon commands, as that term was construed in the Markman orders.  Because the definition of "remote system controller" requires the validation of "logon commands," the WebEx products do not employ "remote system controllers" as that term was construed in the Markman orders. Because the WebEx products do not contain a limitation recited in claim 16 of the '253 patent and claim 1 of the '943 patent, the WebEx products do not literally infringe those claims.  See Cole, 102 F.3d at 532.

Nor do the WebEx products infringe under the doctrine of equivalents because the differences between the design of the WebEx products and the design described in the asserted patent claims is more than "insubstantial."  See Eagle Comtronics, 305 F.3d at 1315. There is a substantial difference between an intermediate element that has the power to validate the information that enables operation of the remote computer and an intermediate element that can only grant access.  To consider the WebEx collaboration server as the equivalent of a "remote system controller" would vitiate the claim limitation that the remote system controller must both check the validity of logon commands and interface the local computer unit with the remote computer unit.  Application of the doctrine of equivalents is therefore not appropriate.  See Lockheed Martin, 324 F.3d at 1321.

## D.   Conclusion

For the reasons stated above, the court concludes that there is no material question of fact regarding whether the WebEx products employ "logon commands," as required by all of the asserted patent claims, or "remote system controllers," as required by claim 16 of the '253 patent or claim 1 of the '943 patent. Because the accused products do not employ these elements required by the asserted patent claims, or the equivalent, WebEx is entitled to summary judgment on ABC's infringement claims.

## IV.   WebEx's Motion for Summary Judgment on Invalidity

WebEx has also moved for summary judgment on the grounds that the '945 patent is invalid for failing to comply with the written description requirement of 35 U.S.C. § 112.  WebEx argues that the patent fails this requirement because, although each claim of the '945 patent requires the use of a website, the specifications of that patent do not describe a "website."   ABC responds that a website is described implicitly in its specifications, and that the concept of a website would have been inherent in the specifications to one of skill in the art at the time of the patent application.

## A.   Applicable Law

An issued patent is presumed valid.   35 U.S.C. § 282; KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. 1727, 1737 (2007).   Because of this presumption, the party challenging a patent must prove the

-30-

facts supporting a determination of invalidity by clear and
convincing evidence.  <u>Apotex USA, Inc. v. Merck & Co., Inc.</u>, 254
F.3d 1031, 1036 (Fed. Cir. 2001).

The written description requirement is found in 35 U.S.C.
§ 112, which provides:

> The specification shall contain a written description of
> the invention, and of the manner and process of making
> and using it, in such full, clear, concise, and exact
> terms as to enable any person skilled in the art to which
> it pertains, or with which it is most nearly connected,
> to make and use the same, and shall set forth the best
> mode contemplated by the inventor of carrying out his
> invention.  35 U.S.C. § 112, ¶ 1.

"[T]he purpose of the written description requirement is to 'ensure
that the scope of the right to exclude, as set forth in the claims,
does not overreach the scope of the inventor's contribution to the
field of art as described in the patent specification.'"  <u>ICU Med.,
Inc. v. Alaris Med. Sys., Inc.</u>, 558 F.3d 1368, 1376 (Fed. Cir.
2009) (quoting <u>Univ. Rochester v. G.D. Searle & Co.</u>, 358 F.3d 916,
920 (Fed. Cir. 2004)).  To comply with 35 U.S.C. § 112's written
description requirement the applicant must "convey with reasonable
clarity to those skilled in the art that, as of the filing date
sought, he or she was in possession of the invention" that is now
claimed.  <u>Id.</u> at 1377.  The description does not need to "recite
the claimed invention in haec verba but must do more than merely
disclose that which would render the claimed invention obvious."
<u>Id.</u>  The written description must actually or inherently disclose
the claim element.  <u>PowerOasis, Inc. v. T-Mobile USA, Inc.</u>, 522

-31-

F.3d 1299, 1306 (Fed. Cir. 2008).  "In order for a disclosure to be inherent, 'the missing descriptive matter must necessarily be present in the [original] application's specification such that one skilled in the art would recognize such a disclosure.'"  <u>TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Electric Co.</u>, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (quoting <u>Tronzo v. Biomet, Inc.</u>, 156 F.3d 1154, 1159 (Fed. Cir. 1998).  "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party."  <u>PowerOasis</u>, 522 F.3d at 1307.

**B.   The Description of "Website" in the '945 Patent**

Claims 3, 4, and 5 of the '945 patent all incorporate the term "website" from the canceled claim 1.[68]  The website plays a central role in the patent claims as the intermediate element between the remote computer unit and the local interface unit, and as the element in the system that validates logon commands.  It is undisputed that the specifications to the '945 patent do not include the term "website."  The original application for the '945

---

[68]'945 Patent, Claim 1 ("the method comprising the steps of: operating a website capable of allowing and facilitating communication between a remote computer unit and an interface unit via an internet; receiving, by the website, a valid logon command from the interface unit . . .; receiving, by the website, data signal instructions from the interface unit; and sending the data signal instructions from the website to the remote computer unit . . .").

patent did not include the term "website" in its claims.[69]  The original application disclosed an element called a "computer service control unit" ("CSCU") that performed the roles of validating logon commands and interfacing remote control signals between the local and remote elements that are performed in the current claims by a "website."[70]  ABC proposed amendments to the patent application including the term "website" in 2004.[71]  The parties dispute whether ABC proposed these amendments in response to discovering that Citrix Systems, Inc. was offering web-based remote computing products.  This dispute and ABC's motive in seeking the amendments are irrelevant to whether or not the '945 patent complies with the written description requirement.  What is relevant is that the '945 patent was ultimately issued in 2006 with each claim disclosing a "website" but without any explicit description of a website in the specifications.[72]

## C.  Analysis

    To comply with the written description requirement the '945 specifications must actually or inherently disclose the element of

---

    [69]<u>See</u> Original Application for the '945 Patent, Exhibit 21 to WebEx's Brief, Docket Entry No. 203.

    [70]<u>Id.</u> at 17, 31.

    [71]<u>See</u> Response in '945 Application, July 6, 2004, Exhibit 23 to WebEx's Brief, Docket Entry No. 203, pp. 13-15.

    [72]'945 Patent, Exhibit 2 to WebEx's Brief, Docket Entry No. 203.

a "website."   See PowerOasis, 522 F.3d at 1306.   Since the
specifications do not mention the term "website," the issue is
whether the specifications inherently disclose the concept of a
website with sufficient clarity that one of skill in the art would
conclude that, as of the filing date, ABC was in possession of the
invention as claimed.

ABC argues that "[a] person of ordinary skill in the art would
understand the patent specification's use of the terms 'browser,'
'internet service provider,' and 'Web/TV,' considered in context
together, to disclose a 'website.'"[73]   ABC cites the expert report
of Ivan Zatkovich, who states, "I have reviewed the '945 Patent,
and find that it does disclose a 'website'.   The '945 Patent
specification's use of the terms 'Web/TV', 'browser', and 'internet
service providers', among others, discloses use of a website."[74]
Zatkovich argues, employing citations to secondary evidence, that
to one of ordinary skill in the art the mention of these elements
in the specifications would make the use of a website apparent.[75]

_____

[73]ABC's Response, Docket Entry No. 211, p. 21.

[74]Expert Rebuttal Report of Ivan Zatkovich, Exhibit 7, A-2 to
ABC's Response, Docket Entry No. 211, p. 29.

[75]See id. at, e.g., 28 ("One of ordinary skill in the art would
understand that a browser is used to access a website by typing in
the site address, known as a URL."); 29 ("One of ordinary skill in
the art understands that Web/TV's 'basic feature is its capability
to display Web pages.'"); 31 ("Since MSN was only ever offered as
a service on the World Wide Web, this would teach one skilled in
the art that it was necessary for the CSCU to be implemented as a
website because it would have been only available as a World Wide
Web service accessibly by a URL using a Web Browser.").

-34-

Zatkovich further states that "[t]hose skilled in the art do not require a detailed description of a website."[76]

WebEx argues that even if the elements cited by ABC could be consistent with the use of a website as the CSCU, the specifications do not necessarily disclose the use of a website as the intermediate element in the invention.  In response to ABC's argument that the use of a website is inherent in the specifications' references to "internet service providers" and "browsers," WebEx points to a statement by ABC's expert that "[i]t was well known in the art in the late '90s that other services available on the World Wide Web included services such as file transfer, command and control interfaces, and transaction processing."[77]  Because internet service providers and browsers could be used to access internet services and features other than websites, WebEx argues that the references to these items in the specifications do not necessarily disclose a website.  WebEx also argues that the specifications' references to Web/TV do not necessarily disclose the use of a website because the Web/TV browser could be used for activities other than accessing websites.[78]

---

[76]Id. at 27.

[77]Affidavit of Ivan Zatkovich, May 28, 2009, Exhibit 36 to WebEx's Brief, Docket Entry No. 203, ¶ 34.

[78]WebEx's Brief, Docket Entry No. 203, p. 9.

The court agrees that any individual reference to an internet service provider, a browser, or Web/TV does not necessarily disclose the use of a website because these items could be used to access internet services other than websites.  The question, though, is whether the references in the patent when taken together, in the context of a patent describing a remote-computing system, would lead a person reasonably skilled in the art to conclude that a website had necessarily been disclosed.  ABC has presented expert testimony that a person skilled in the art would read the references in context as disclosing the use of a website.

WebEx argues that a number of decisions and statements by patent examiners considering the '945 and '943 patents support its argument that the '945 patent fails to meet the written description requirement.  First, WebEx points to the decision of the patent examiner to reject claims in the '943 patent application using the term "website" on the grounds that the claims failed to comply with the enablement requirement of 35 U.S.C. § 112.[79]  The examiner stated, "[T]here is no disclosure in the specification of establishing a remote system controller as a web site on an internet."[80]  This evidence is of limited relevance because the examiner's decision ultimately concerned a different legal question -- enablement -- applied to a different set of claims.

---

[79]Office Action for '943 Patent, December 1, 2004, Exhibit 25 to WebEx's Brief, Docket Entry No. 203, p. 2.

[80]_Id._

Next, WebEx points to a statement by the panel of examiners considering the reexamination of the '945 patent:

> The Examiner notes . . . that the "website" limitations in e.g. instant claim 1 are not supported by the specification of the Patent under reexamination.  Indeed there is no description in the specifications of any website, nor any description of how a website is utilized to perform any of the steps recited in the claims.[81]

WebEx notes that the panel was not empowered during the reexamination to reject existing claims for failure to comply with the written description requirement,[82] and thus suggests that the panel's decision to allow claims 3, 4, and 5 does not mean that the claims comply with the written description requirement.

Third, WebEx points to the decision of the Canadian Patent Office to reject ABC's amended claims using the term "website" in ABC's application for the Canadian version of the '945 patent.  The Canadian Patent Office rejected the claims on the grounds that the subject matter of the amended claims "is not reasonably to be inferred from the specifications or drawings as originally filed."[83] The Canadian Patent Office explained, "there is no mention of operating a website by supplying a valid logon command from a remote computer or receiving and sending data instructions from and

---

[81]Final Office Action in '945 Patent Reexamination, October 3, 2008, Exhibit 27 to WebEx's Brief, Docket Entry No. 203, p. 10.

[82]<u>See</u> Manual of Patent Examination Procedure § 2258, Exhibit 28 to  WebEx's Brief, Docket Entry No. 203, at 2200-2289.

[83]Action in Canadian Application '772, February 15, 2007, Exhibit 32 to WebEx's Brief, Docket Entry No. 203, p. 1.

to the website in the originally filed specification."[84]  ABC argues that the decision of the Canadian Patent Office to reject the claims is irrelevant because Canadian patent law uses a different legal standard for its written description requirement.

Of the three decisions of patent examiners cited by WebEx, the only one that has significant relevance is the statement by the panel of examiners in the reexamination of the '945 patent because those patent examiners were the only ones who considered the actual patent claims and specifications in issue.  The panel concluded that "the 'website' limitations . . . are not supported by the specification of the Patent."[85]  The panel, however, was not faced with the question of whether the patent complied with the written description requirement.  The only examiner to date who was tasked with that question was the examiner who deemed the patent acceptable as written on February 14, 2006.[86]  Because the court must presume the patent to be valid, see 35 U.S.C. § 282, the court assumes that the patent examiner who accepted the '945 patent deemed it to comply with the written description requirement of 35 U.S.C. § 112, ¶ 1.  The court therefore cannot conclude that the statements of other patent examiners considering other questions

---

[84]Id. at 2.

[85]Final Office Action in '945 Patent Reexamination, October 3, 2008, Exhibit 27 to WebEx's Brief, Docket Entry No. 203, p. 10.

[86]See '945 patent, Exhibit 2 to WebEx's Brief, Docket Entry No. 203, at cover.

necessarily show that the written description requirement has not been met.

**D.  Conclusion**

It is highly debatable whether the specifications' references to "browsers," "internet service providers," and "Web/TV" necessarily disclose the use of a website as the crucial intermediate element in the claimed remote computing system.  What matters, though, is that the question is debatable.  Summary judgment is not proper on this question of fact unless "no reasonable fact finder could return a verdict for the non-moving party."  See PowerOasis, 522 F.3d at 1307.  ABC can present to a jury the fact that a patent examiner evidently deemed the '945 patent claims acceptable as written.  It can also present expert testimony that a person of reasonable skill in the art would have viewed the use of a website as inherent in the terms used in the patent specifications.  The court cannot say with certainty that no jury would find ABC's expert persuasive.  Therefore, the court will deny WebEx's motion for summary judgment regarding the invalidity of the '945 patent.

**V.  Conclusion and Order**

For the reasons explained above, the court concludes that there are no material questions of fact regarding whether WebEx's products employ logon commands as required by ABC's asserted claims

for the '253, '945, and '943 patents.  The court concludes that there are, however, material questions of fact regarding whether the '945 patent is invalid for failing to comply with the written description requirement of 35 U.S.C. § 112.  Accordingly, WebEx's Motion for Summary Judgment (Docket Entry No. 203) is **GRANTED** regarding noninfringement, but **DENIED** regarding invalidity of the '945 patent.[87]

WebEx's counterclaim against ABC seeking a declaratory judgment of unenforceability of the '253 patent, the '945 patent, and the '943 patent (Docket Entry No. 186) remains pending.  The parties will file the Joint Pretrial Order by July 2, 2010.

**SIGNED** at Houston, Texas, on this 26th day of April, 2010.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

---

[87]The court has carefully considered the parties' arguments in reaching its decisions.  Given the thoroughness of the parties' briefs it is highly unlikely that the court would alter its decisions based on motions for reconsideration.

-40-